**Barry ESCOTT et al., on behalf of themselves and in a representative capacity on behalf of all other present and former holders of 5½% subordinated debentures (due May 1, 1976) of the BarChris Construction Corporation, similarly situated, Plaintiffs,**

v.

**BARCHRIS CONSTRUCTION CORPORATION et al., Defendants.**

**No. 62 Civ. 3539.**

United States District Court
S. D. New York.
March 29, 1968.

Garey & Garey, New York City, for plaintiffs, Wm. Francis Corson, Allan K. Peckel, New York City, of counsel.

Alex L. Rosen, New York City, for defendant, BarChris Construction Corp.

Davis, Polk & Wardwell, New York City, for defendants Drexel & Co., and others, Ralph M. Carson, Thomas P. Griesa, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, Attorneys for defendant,

Peat, Marwick, Mitchell & Co., A. Donald MacKinnon, Andrew J. Connick, New York City, of counsel.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant, Grant, John Logan O'Donnell, James E. Tolan, New York City, of counsel.

Sims & Friedman, New York City, for defendants, Vitolo, Russo and Pugliese, Theodore R. Schreier, New York City, of counsel.

Emmet, Marvin & Martin, New York City, for defendants, Kircher and Trilling, James J. Higginson, New York City, of counsel.

Schoengold & Sporn, New York City, for defendant, Birnbaum, Max Schoengold, New York City, of counsel.

Ferris, Bangs, Davis, Trafford & Syz, New York City, for defendant, Auslander, Lyon Boston, New York City, of counsel.

Mullane & Moukad, New York City, for defendant, Rose, Joseph E. Moukad, New York City, of counsel.

## OPINION

McLEAN, District Judge.

This is an action by purchasers of 5½ per cent convertible subordinated fifteen year debentures of BarChris Construction Corporation (BarChris). Plaintiffs purport to sue on their own behalf and "on behalf of all other and present and former holders" of the debentures. When the action was begun on October 25, 1962, there were nine plaintiffs. Others were subsequently permitted to intervene. At the time of the trial, there were over sixty.

The action is brought under Section 11 of the Securities Act of 1933 (15 U.S.C. § 77k). Plaintiffs allege that the registration statement with respect to these debentures filed with the Securities and Exchange Commission, which became effective on May 16, 1961, contained material false statements and material omissions.

Defendants fall into three categories: (1) the persons who signed the registration statement; (2) the underwriters, consisting of eight investment banking firms, led by Drexel & Co. (Drexel);[1] and (3) BarChris's auditors, Peat, Marwick, Mitchell & Co. (Peat, Marwick).

The signers, in addition to BarChris itself, were the nine directors of BarChris, plus its controller, defendant Trilling, who was not a director. Of the nine directors, five were officers of BarChris, i. e., defendants Vitolo, president; Russo, executive vice president; Pugliese, vice president; Kircher, treasurer; and Birnbaum, secretary. Of the remaining four, defendant Grant was a member of the firm of Perkins, Daniels, McCormack & Collins, BarChris's attorneys. He became a director in October 1960. Defendant Coleman, a partner in Drexel, became a director on April 17, 1961, as did the other two, Auslander and Rose, who were not otherwise connected with BarChris.

Defendants, in addition to denying that the registration statement was false, have pleaded the defenses open to them under Section 11 of the Act, plus certain additional defenses, including the statute of limitations. Defendants have also asserted cross-claims against each other, seeking to hold one another liable for any sums for which the respective defendants may be held liable to plaintiffs.

This opinion will not concern itself with the cross-claims or with issues peculiar to any particular plaintiff. These matters are reserved for later decision. On the main issue of liability, the questions to be decided are (1) did the registration statement contain false statements of fact, or did it omit to state facts which should have been stated in order to prevent it from being misleading; (2) if so, were the facts which were falsely stated or omitted "material" within the meaning of the Act; (3) if so, have defendants established their affirmative defenses?

---

1. The action has been severed as against one underwriter, Ira Haupt & Co., which is in bankruptcy.

Before discussing these questions, some background facts should be mentioned. At the time relevant here, BarChris was engaged primarily in the construction of bowling alleys, somewhat euphemistically referred to as "bowling centers." These were rather elaborate affairs. They contained not only a number of alleys or "lanes," but also, in most cases, bar and restaurant facilities.

BarChris was an outgrowth of a business started as a partnership by Vitolo and Pugliese in 1946. The business was incorporated in New York in 1955 under the name of B & C Bowling Alley Builders, Inc. Its name was subsequently changed to BarChris Construction Corporation.

The introduction of automatic pin setting machines in 1952 gave a marked stimulus to bowling. It rapidly became a popular sport, with the result that "bowling centers" began to appear throughout the country in rapidly increasing numbers. BarChris benefited from this increased interest in bowling. Its construction operations expanded rapidly. It is estimated that in 1960 BarChris installed approximately three per cent of all lanes built in the United States. It was thus a significant factor in the industry, although two large established companies, American Machine & Foundry Company and Brunswick, were much larger factors. These two companies manufactured bowling equipment, which BarChris did not. They also built most of the bowling alleys, 97 per cent of the total, according to some of the testimony.

BarChris's sales increased dramatically from 1956 to 1960. According to the prospectus, net sales, in round figures, in 1956 were some $800,000, in 1957 $1,300,000, in 1958 $1,700,000. In 1959 they increased to over $3,300,000, and by 1960 they had leaped to over $9,165,000.[2]

For some years the business had exceeded the managerial capacity of its founders. Vitolo and Pugliese are each men of limited education. Vitolo did not get beyond high school. Pugliese ended his schooling in seventh grade. Pugliese devoted his time to supervising the actual construction work. Vitolo was concerned primarily with obtaining new business. Neither was equipped to handle financial matters.

Rather early in their career they enlisted the aid of Russo, who was trained as an accountant. He first joined them in the days of the partnership, left for a time, and returned as an officer and director of B & C Bowling Alley Builders, Inc. in 1958. He eventually became executive vice president of BarChris. In that capacity he handled many of the transactions which figure in this case.

In 1959 BarChris hired Kircher, a certified public accountant who had been employed by Peat, Marwick. He started as controller and became treasurer in 1960. In October of that year, another ex-Peat, Marwick employee, Trilling, succeeded Kircher as controller. At approximately the same time Birnbaum, a young attorney, was hired as house counsel. He became secretary on April 17, 1961.[3]

In general, BarChris's method of operation was to enter into a contract with a customer, receive from him at that time a comparatively small down payment on the purchase price, and proceed to construct and equip the bowling alley. When the work was finished and the building delivered, the customer paid the balance of the contract price in notes, payable in installments over a period of

2. Plaintiffs attack the accuracy of this figure. Their claim in this respect will be considered hereinafter.

3. These newcomers were active in their respective positions from the time of their original employment by BarChris throughout the period in question here. In 1962, however, they all departed. Birnbaum resigned on February 9, 1962, Kircher and Trilling resigned on April 30, 1962. Russo, the oldest in point of service, resigned in July 1962.

Of the four nonofficer directors, Auslander resigned in November 1961 and Rose in March 1962. Grant resigned in March 1962. Coleman also resigned in March 1962 but he returned to the board on July 3, 1962 and finally resigned on October 25, 1962.

years. BarChris discounted these notes with a factor and received part of their face amount in cash. The factor held back part as a reserve.

In 1960 BarChris began a practice which has been referred to throughout this case as the "alternative method of financing." In substance this was a sale and leaseback arrangement. It involved a distinction between the "interior" of a building and the building itself, i. e., the outer shell. In instances in which this method applied, BarChris would build and install what it referred to as the "interior package." Actually this amounted to constructing and installing the equipment in a building. When it was completed, it would sell the interior to a factor, James Talcott Inc. (Talcott), who would pay BarChris the full contract price therefor. The factor then proceeded to lease the interior either directly to BarChris's customer or back to a subsidiary of BarChris. In the latter case, the subsidiary in turn would lease it to the customer.

Under either financing method, BarChris was compelled to expend considerable sums in defraying the cost of construction before it received reimbursement.[4] As a consequence, BarChris was in constant need of cash to finance its operations, a need which grew more pressing as operations expanded.

In December 1959, BarChris sold 560,000 shares of common stock to the public at $3.00 per share. This issue was underwritten by Peter Morgan & Company, one of the present defendants.

By early 1961, BarChris needed additional working capital. The proceeds of the sale of the debentures involved in this action were to be devoted, in part at least, to fill that need.

The registration statement of the debentures, in preliminary form, was filed

with the Securities and Exchange Commission on March 30, 1961. A first amendment was filed on May 11 and a second on May 16. The registration statement became effective on May 16. The closing of the financing took place on May 24. On that day BarChris received the net proceeds of the financing.

By that time BarChris was experiencing difficulties in collecting amounts due from some of its customers. Some of them were in arrears in payments due to factors on their discounted notes. As time went on those difficulties increased. Although BarChris continued to build alleys in 1961 and 1962, it became increasingly apparent that the industry was overbuilt. Operators of alleys, often inadequately financed, began to fail. Precisely when the tide turned is a matter of dispute, but at any rate, it was painfully apparent in 1962.

In May of that year BarChris made an abortive attempt to raise more money by the sale of common stock. It filed with the Securities and Exchange Commission a registration statement for the stock issue which it later withdrew. In October 1962 BarChris came to the end of the road. On October 29, 1962, it filed in this court a petition for an arrangement under Chapter XI of the Bankruptcy Act.[5] BarChris defaulted in the payment of the interest due on November 1, 1962 on the debentures.

*The Debenture Registration Statement*

In preparing the registration statement for the debentures, Grant acted for BarChris. He had previously represented BarChris in preparing the registration statement for the common stock issue. In connection with the sale of common stock, BarChris had issued purchase warrants. In January 1961 a second registration statement was filed in order to

4. Under the sale and leaseback arrangement, Talcott paid part of the price to BarChris as the work progressed.

5. The Chapter XI proceeding was converted into a straight bankruptcy in March 1963. Thereafter the adjudication in

bankruptcy was vacated and in November 1963 BarChris was placed in reorganization under Chapter X of the Bankruptcy Act. That proceeding is still pending. BarChris's trustees have appeared for it in this action.

update the information pertaining to these warrants. Grant had prepared that statement as well.

Some of the basic information needed for the debenture registration statement was contained in the registration statements previously filed with respect to the common stock and warrants. Grant used these old registration statements as a model in preparing the new one, making the changes which he considered necessary in order to meet the new situation.

The underwriters were represented by the Philadelphia law firm of Drinker, Biddle & Reath. John A. Ballard, a member of that firm, was in charge of that work, assisted by a young associate named Stanton.

Peat, Marwick, BarChris's auditors, who had previously audited BarChris's annual balance sheet and earnings figures for 1958 and 1959, did the same for 1960. These figures were set forth in the registration statement. In addition, Peat, Marwick undertook a so-called "S–1 review," the proper scope of which is one of the matters debated here.

The registration statement in its final form contained a prospectus as well as other information. Plaintiffs' claims of falsities and omissions pertain solely to the prospectus, not to the additional data.

The prospectus contained, among other things, a description of BarChris's business, a description of its real property, some material pertaining to certain of its subsidiaries, and remarks about various other aspects of its affairs. It also contained financial information. It included a consolidated balance sheet as of December 31, 1960, with elaborate explanatory notes. These figures had been audited by Peat, Marwick. It also contained unaudited figures as to net sales, gross profit and net earnings for the first quarter ended March 31, 1961, as compared with the similar quarter for 1960. In addition, it set forth figures as to the company's backlog of unfilled orders as of March 31, 1961, as compared with March 31, 1960, and figures as to BarChris's contingent liability, as of April 30, 1961, on customers' notes discounted and its contingent liability under the so-called alternative method of financing.

Plaintiffs challenge the accuracy of a number of these figures. They also charge that the text of the prospectus, apart from the figures, was false in a number of respects, and that material information was omitted. Each of these contentions, after eliminating duplications, will be separately considered.[6]

*1960 Net Sales, Net Operating Income and Earnings per Share*

The earnings figure set forth at page 4 of the prospectus shows net sales for the calendar year 1960 of $9,165,320. Plaintiffs claim that this figure was overstated by $2,525,350. They assert that it necessarily follows that the figure of $1,742,801 shown in the prospectus as net operating income for 1960, and the figure of earnings per share of $.75, were also incorrect.

The net sales figure included amounts actually billed by BarChris for alleys completed by it in 1960 and amounts considered billable, although not in fact billed, for alleys not completed but still in process at the end of the year. The latter amounts were computed by using the percentage of completion method. The fact that this method was employed was disclosed in a footnote to the earnings table on page 4 of the prospectus.

6. The testimony on many subjects in this case is confused. It is scattered over some 6,500 pages of stenographic minutes without any coherent explanation all in one place. To some extent this was inevitable, in view of the number of defendants, each of whom cross-examined the witnesses, plus the fact that plaintiffs, for the most part, were compelled to prove their case out of the mouths of hostile witnesses. I have examined this material, but there is no need to recount it in great detail in this opinion. On each issue I shall state plaintiffs' contention and my findings of fact with respect to it, which are based upon all the evidence related to that issue.

### Alleys in Process on December 31, 1960

█ The greater part of the alleged overstatement of net sales is attributable to the use of the percentage of completion method. It accounts for $2,002,250 out of the total alleged overstatement of $2,525,350. Plaintiffs contend that the percentage of completion method should not have been used at all, i. e., that nothing should have been included in sales for alleys on which construction was still in progress on December 31, 1960. They say further that in any event this method was not properly applied, so that the amount included for such transactions was incorrect, even assuming that it was appropriate to include something for them.

By and large, I do not accept these contentions. The evidence shows that generally accepted accounting principles sanction the inclusion in sales for one year of part of the consideration ultimately to be received for work in progress which spreads over more than one year. Otherwise the figures would be distorted by reflecting the entire consideration in the sales for the year in which the work was finally completed. The same principle had been followed by BarChris, with Peat, Marwick's knowledge and approval, in 1959. I find that it was proper to employ it also for 1960.

I also find that, except for two specific instances hereinafter noted, this principle was correctly applied in determining the amount to be included in 1960 sales for these uncompleted jobs.

BarChris had records of the cost actually expended on each job up to December 31, 1960. The accuracy of these figures is not challenged by plaintiffs. BarChris's engineering department, under Pugliese's supervision, prepared estimates of the costs which were still to be incurred in order to complete each job. The total of the past costs plus estimated future costs constituted the estimated total cost for each job. Comparison of the costs to date with the total estimated cost showed the extent to which each job had been completed by December 31, 1960, i. e., the percentage of completion.

In the course of its audit of BarChris's records for 1960, Peat, Marwick made an independent check of the accuracy of BarChris's estimate. Berardi, Peat, Marwick's senior accountant engaged in this audit, tabulated BarChris's actual costs on eleven jobs, both large and small, which BarChris had completed. By subtracting the total cost from the contract price, he computed the profit which BarChris had actually made on each job. The percentage of profit to contract price varied from one job to another. The overall average was approximately 25 per cent.

Proceeding on the assumption, for the purposes of this test check, that the profit on each presently uncompleted job would also be 25 per cent, Berardi deducted this from the contract price of the job. The difference represented the total cost. With two exceptions, these cost figures tallied closely with Pugliese's estimates and produced approximately the same percentage of completion for each job. Having thus satisfied himself of the reasonable accuracy of the percentage, Berardi, except in two instances, applied this percentage to the total contract price of each unfinished job and included in 1960 sales that percentage of the total contract price as having been earned in 1960.

Plaintiffs quarrel with Berardi's test check. They point out that if he had used a different group of completed jobs in his analysis, he would have come up with a lower average profit figure and hence with a higher total cost and eventually with a lower percentage of completion on the unfinished jobs. This is, of course, true. By the same token, still another group of jobs might have produced a higher profit and hence a lower total cost and a higher percentage of completion. There is no convincing evidence to show that the procedure which Berardi employed was not compatible with good accounting practice. Viewed as of the time of the audit, without regard to

later events not then known, Berardi's method seems to me to have been reasonable. On the whole, therefore, I find that plaintiffs have failed to prove that the net sales figure was false by reason of the inclusion in it of amounts attributable to unfinished contracts.

It remains to consider the two exceptions. These jobs were Worcester and Atlas-Bedford. In these instances Berardi's test check yielded a markedly different result from that produced by Pugliese's estimates. Consistent application of Berardi's 25 per cent profit formula would have indicated that these jobs were only 57 per cent and 48 per cent completed, respectively, on December 31, 1960.

Pugliese's estimate, plus actual costs to date, indicated completion percentages of approximately 78 per cent and 82 per cent respectively. Berardi treated each job as 100 per cent completed. He included in 1960 sales the full contract price of $460,000 for Worcester and $265,000 for Atlas-Bedford.

Berardi did this on the theory that each job was so nearly finished that for practical purposes it could be considered fully completed. The evidence does not bear this out. A report of an actual inspection of Worcester on January 4, 1961 indicated a 75 per cent completion by that date. No report of any physical inspection of Atlas-Bedford was produced.

It could be argued that to be consistent, Berardi should have used his own formula with respect to these two alleys. To have done so would have produced sales as to them of only approximately one-half of the amount which he included.

It is manifest, however, that a strict application of the formula would have been inappropriate, at least in the case of Worcester, for physical inspection of that job showed that in fact it was much nearer completion than 57 per cent. Hence it was proper to reject in this instance the formula based on historical experience with other jobs.

There was no justification, however, for treating these two jobs as fully finished. The highest percentage of completion which the evidence permits is that indicated by Pugliese's estimates. I find that it would have been correct to use his figures. On that basis, the result is as follows: 78 per cent of the Worcester contract price of $460,000 is $358,800. The difference between that and $460,000 is $101,200. The sales figure for Worcester was therefore overstated by $101,200. 82 per cent of the Atlas-Bedford contract price of $265,000 is $217,300. The difference between that amount and $265,000 is $47,700. The Atlas-Bedford sales figure was thus overstated by $47,700.

Plaintiffs claim that the inclusion of any sales figure for Worcester and Atlas was incorrect for a wholly different reason. They say that the Worcester contract was cancelled. But actually the cancellation was merely the substitution of a new purchaser for the original one. This substitution occurred in March 1961. There was no reduction in the contract price. The alley was eventually built and the new customer was billed for the full contract price in June 1961. There is thus no merit to plaintiffs' contention.

As to Atlas-Bedford, plaintiffs point to the fact that the original contract dated August 12, 1960, with a contract price of $265,000, the figure used in computing the 1960 sales, was superseded in 1961 by a new contract containing a reduced contract price of $202,000, a difference of $63,000. They argue that $202,000 should have been the figure used in the 1960 computation. But the testimony is that the superseding contract was made in order to give Atlas the benefit of a $63,000 credit to which it was entitled because BarChris did not furnish certain equipment. The evidence is that this credit was reflected on BarChris's books by reducing sales in the first quarter of 1961, which appears to be the time when the credit arose. I am not persuaded that the 1960 rather than the 1961 sales should have been reduced

by this credit. Consequently, I do not accept plaintiffs' contention in this respect.

I turn now to plaintiffs' other criticisms of the 1960 net sales figure.

### Westover Lanes

Plaintiffs claim that the full contract price of this job was included in 1960 sales in disregard of the fact that the contract price had been reduced by $18,100. I reject this contention. It is true that the contract price was reduced and it is also true that the work papers list the full contract price of $181,000 without specific reference to this reduction. But the work papers also include a lump sum adjustment of $61,056.54 put in to make the figures on the work sheets agree with the sales account in the general ledger. The general ledger account is made up of many plusses and minusses, i. e., increases and reductions of sales. It sufficiently appears that the reduction of $18,100 in the Westover contract price was reflected in this account. Thus, the lump sum adjustment of $61,056.54 brought this reduction into the final computation. It was taken into account despite the fact that the work papers did not specifically mention it.

### Burke Lanes

Here plaintiffs point out that the work sheets included in sales the sum of $136,000 for this job. Of this sum, $111,000 was the original contract price and $25,000 was labeled "extra work." But BarChris's books of account show the receipt of only $111,000 on the Burke Lanes contract.

The explanation offered by defendants merely confirms plaintiffs' contention that this $25,000 should not have been included. It was not part of the price of any construction. The testimony is that it was in effect a loan made by BarChris to Burke's landlord, a payment made by BarChris to a third person at the landlord's request for his account. It is impossible to tell whether the landlord ever repaid BarChris the $25,000, except that apparently he did pay $600 in October 1960. In any event, this $25,000 was not a sale and should not have been included in the sales figure.

### Unsold Alleys

We come now to items of more importance, namely, the inclusion in 1960 sales of the contract price of completed alleys which in fact were not sold by BarChris.

### Capitol Lanes

Capitol was also known as Heavenly Lanes.[7] The premises were located in East Haven, Connecticut.

Heavenly Lanes was listed in the 1960 computations as a completed contract. The contract price of $330,000 was included in 1960 sales.

BarChris originally had a contract to construct Heavenly Lanes for an outside customer. Despite all the testimony on this subject, the date of the contract and the name of the customer never emerged. In any event, it is clear that that customer did not go through with the contract.

On July 29, 1960, BarChris entered into a contract with its wholly-owned subsidiary, BarChris Leasing Corporation, described in the contract as the purchaser, to build this alley. BarChris went ahead and constructed the alley and completed it before December 31, 1960. It never sold it to any outside interest. Purely as a financing mechanism, it sold the alley to Talcott, a factor, who leased it back to Capitol Lanes, Inc., a new corporation organized by BarChris in December 1960, the stock of which was owned by Sanpark Realty Corp., itself a wholly owned subsidiary of BarChris.

Capitol Lanes, Inc. operated the alley beginning in December 1960. BarChris's minutes show that BarChris con-

---

7. It appears that alleys often had more than one name. For example, in addition to Capitol-Heavenly, Federal Lanes was also called Betsytown, Bridge Lanes was sometimes referred to as Whitestone, etc. In dealing with accounting problems as complex as BarChris's, this double nomenclature was a fertile source of confusion.

templated its operation as early as November 22, 1960. There is no doubt that nothing should have been included in the 1960 sales figure for this alley. Consequently, the sales figure was inflated by $330,000.

### Howard Lanes Annex

On January 15, 1960, BarChris entered into a contract with Howard Lanes Company, a Connecticut partnership, to build an alley in Greenwich, Connecticut, for $320,000. It was to contain tenpin lanes. This alley was built and sold and no question is raised as to the propriety of including the $320,000 in 1960 sales.

Prior to the end of 1960, the purchaser decided that it also wanted an annex to be constructed to house duckpin lanes. The contract price for the annex was $150,000. This sum was also included in the 1960 sales figures.

BarChris agreed to build the annex and eventually did build it. But it did not sell it to Howard Lanes. Instead, it retained title through a subsidiary and leased the annex to Howard. Although there was some testimony to the effect that Howard had an option to buy the property, this was not established by any documentary evidence, for the lease was never produced. The testimony on the subject is not sufficiently definite to be credible.

Some of the documents on this subject are dated in the spring of 1961. Thus, on March 1, 1961, BarChris entered into a contract with its wholly owned subsidiary, BarChris Leasing Corporation, for the construction of the annex. This contract apparently was executed as a preliminary to obtaining financing for this project which was secured from a lender known as Credit Industrial Corporation in 1961.

Although the ˙fact that these documents were executed in March 1961 rather than in 1960 has a bearing upon whether Peat, Marwick should have discovered them in the course of its 1960 audit, that is not the present question. It is clear for present purposes that the $150,000 should not have been included in

1960 sales because the annex was not sold. Consequently, the sales figure was overstated by that amount.

### Bridge Lanes

Bridge Lanes was a job which was in process on December 31, 1960. A portion of the contract price of this job was included in 1960 sales on the percentage of completion method.

BarChris had a contract to build this alley for a company known as Biel Land & Development Company. In the spring of 1961 BarChris acquired the stock of Biel and thereafter operated the alley through a subsidiary of BarChris, Parkway Lanes, Inc. Although this transaction has a bearing upon the accuracy of the figures for March 31, 1961, a subject to be discussed hereinafter, it seems to have no relevance to the accuracy of the December 31, 1960 sale figure. As of that date, BarChris was performing a contract with an outside purchaser. It was, therefore, proper to include a portion of that contract price in 1960 sales.

### Summary

■ To recapitulate, I find that the 1960 sales figure of $9,165,320, as stated in page 4 of the prospectus, was inaccurate in that it included the following amounts which should not have been included:

| | |
|---|---:|
| Worcester | $101,200 |
| Atlas-Bedford | 47,700 |
| Burke | 25,000 |
| Capitol | 330,000 |
| Howard Lane Annex | 150,000 |
| Total | $653,900 |

The total figure, instead of $9,165,320, should have been $8,511,420.

It necessarily follows that the figure for net operating income for 1960 appearing on page 4 of the prospectus was also incorrect. The extent to which it was incorrect depends upon the extent to which the incorrect sales figure for the five alleys in question was carried into profits.

In the case of Capitol, an alley completed in 1960, the difference between its contract price and its cost was reflected in profits. This difference was $89,773. Since the alley was not sold, no profit should have been taken on it. Hence, as to this alley, profits were inflated by $89,773.

The same is true of Howard Lanes Annex. Here the sum incorrectly included in profits was $72,846.

As to Burke, the entire $25,000 erroneously added to the contract price was carried into profits. Since the $25,000 was not part of the contract price of the job, no part of this sum should have been reflected in profits.

Worcester and Atlas-Bedford, as we have seen, were incorrectly treated as fully completed in 1960. The difference between their contract price and their total cost, actual and estimated, was treated as profit. This amount, in the case of Worcester, was $197,280, and in the case of Atlas-Bedford, $143,706. The correct profit figure for 1960 was the difference between that portion of the contract price which was properly includible in sales and the cost actually incurred in 1960. This figure in the case of Worcester is approximately $161,000 and in the case of Atlas-Bedford, $121,000. Profits on Worcester were thus inflated by the difference between $197,280 and $161,000 i. e., $36,280, and as to Atlas-Bedford, by the difference between $143,706 and $121,000, i. e., $22,706.

It follows that profit, and consequently net operating income, was overstated in the following amounts:

| | | |
|---|---|---|
| Capitol | | $ 89,773 |
| Howard Lanes Annex | | 72,846 |
| Burke | | 25,000 |
| Worcester | | 36,280 |
| Atlas-Bedford | | 22,706 |
| | Total | $246,605 |

The net operating income, instead of $1,742,801, should have been $1,496,196.

Since the net operating income figure was incorrect, it necessarily follows that the ultimate result of the entire table, i. e., the earnings per share figure, was incorrect. The evidence does not permit precise determination of the amount of this error. Since the net operating income figure as restated is approximately 14 per cent less than the figure stated in the prospectus, it would seem to be true, speaking roughly, that the earnings per share figure should be reduced by approximately the same percentage. To do so would produce an earnings per share figure of approximately 65¢ per share rather than 75¢.

### 1960 Balance Sheet

The prospectus contained a balance sheet as of December 31, 1960 of BarChris and consolidated subsidiaries. This was audited by Peat, Marwick. Plaintiffs attack its accuracy on a variety of grounds.

### Current Assets

They charge that current assets were grossly overstated because several items were incorrectly classified as current. These are discussed below.

### Cash

Cash on hand as of December 31, 1960, as per the balance sheet, amounted to $285,482. This amount actually was on hand on that day. But plaintiffs contend, and I believe correctly, that certain rather peculiar circumstances relating to this cash balance should have been disclosed.

The evidence is that Talcott held certain reserves in the sum of $147,466.80 as security with respect to customers' notes discounted with Talcott by BarChris Financial Corporation, a wholly owned subsidiary of BarChris. The accounts of BarChris Financial Corporation were not consolidated with those of BarChris in the balance sheet, as the accounts of the other subsidiaries were. BarChris Financial Corporation was covered only by a blind reference to "Investments In (At Equity) And Advances to Non-Consolidated Subsidiary."

On December 22, 1960, at Russo's request, Talcott released the $147,466.80 to

BarChris Financial Corporation temporarily, on the latter's agreement to redeposit it with Talcott not later than January 16, 1961, so that Talcott could continue to hold it as security. BarChris Financial Corporation then paid $145,000 of this sum to BarChris, which put it into one of BarChris's bank accounts. It was thus reflected in the cash balance as of December 31, 1960.[8]

Plaintiffs claim that this transaction was arranged by Russo in order to increase BarChris's cash temporarily, so that its financial condition would look better on December 31, 1960. No other explanation was offered by defendants and I can see none.

As far as the accuracy of the balance sheet is concerned, the $145,000 undoubtedly was an asset of BarChris Financial Corporation, subject only to Talcott's lien. It would seem that under the circumstances it would have been more accurate to include this amount, not in cash, but in "investment in non-consolidated subsidiary." The latter item is not a current asset, hence to put it there would have reduced current assets by $145,000. In any event, to treat it as cash on hand without some explanation of the temporary character of the deposit was misleading. The incident is important for the light that it sheds upon BarChris's business practices. This has a bearing upon the credibility of some of BarChris's officers and the weight to be given to their testimony in other respects.

### Trade Accounts Receivable

█ The balance sheet includes in current assets trade accounts receivable in the sum of $1,722,643. Plaintiffs assert that $1,157,973 of this total was improperly classified as current. This is the

sum of amounts due from purchasers of seven different alleys. None of these amounts had been due for more than ninety days. The contracts provided that the customers would pay by delivering notes payable over a period of years. Plaintiffs say that only that portion of the receivable which would be represented by notes payable within one year should have been treated as a current asset.

But it is clear that BarChris's practice was to discount such notes, as soon as it received them, with a factor. Upon discounting them, BarChris would receive at once in cash the full amount of the notes, less such reserve as the factor might retain as security. This practice was disclosed in a footnote to the balance sheet. In view of this fact, I find that these receivables were properly classified as a current asset.

### Federal Lanes

█ Plaintiffs also complain about a receivable due from Federal Lanes representing a down payment under its contract for the purchase of an alley. The amount was $125,000. It had been overdue since July 31, 1960. As it turned out, BarChris never did collect this $125,000. Federal eventually went into bankruptcy. Plaintiffs say that the uncollectibility of this debt was so obvious on December 31, 1960 that a full reserve should have been set up against it, thereby reducing current assets accordingly.

Russo seems to have believed that $100,000 of this $125,000 had been paid by the delivery by Federal and the acceptance by BarChris of 36,400 shares of Federal stock in lieu of cash. Of course, if this were true, $100,000 was not a receivable at all, and the stock

---

8. In his memorandum of December 23, 1960 explaining this transaction, Russo stated that "James Talcott may misfile this letter and, therefore, the return of this money to them may not be required." The evidence shows that Talcott did not overlook it. The evidence indicates, although not very clearly, that BarChris restored to Talcott all but $50,000 of this

$147,466.80. Whether it did so by January 16, 1961, in accordance with its agreement, does not appear. As late as April and May 1961, Talcott was still demanding that BarChris restore the remaining $50,000 and Russo was apparently putting Talcott off. It does not clearly appear whether BarChris ultimately paid this $50,000 to Talcott.

should have been shown as an asset of BarChris. This was not done.

The agreement between Federal and BarChris on this subject was not lucidly expressed. However, it is clear that, Russo notwithstanding, BarChris's accounting department did not treat the receipt of this stock as part payment. Instead, they treated it on BarChris's books as security for an account receivable still unpaid in the amount of $125,000. It was because of the existence of this security, which on December 31, 1960 had some value, plus the existence of additional security in the form of a mortgage, that it was decided to treat this $125,000 as fully collectible.

There are other facts, in addition to the age of this receivable, which cast doubt on the wisdom of this decision. Federal had also delivered notes to BarChris in payment of the balance of the purchase price over and above the down payment. These notes were discounted with Talcott. On December 31, 1960 they were in arrears to the extent of $24,366.-66. This was substantially more than the arrearages of any other customer on notes discounted with Talcott as of that date. This was a clear indication, if any were needed, that all was not right with Federal.

I am well aware that this question of adequate reserves must be determined in the light of the facts as they existed at the time, not as they later developed. Nevertheless, I believe that the prospects for Federal were so bad, even on December 31, 1960, that some reserve should have been set up against the probability that this $125,000 would never be collected. In view of the security in the form of the stock and the mortgage, a reserve of the full $125,000 would not appear to have been necessary. I find that a reserve of at least $50,000 should have been created, and that the current assets should have been reduced in that amount.

### Howard Lanes Annex

■ Trade accounts receivable included $150,000 for Howard Lanes Annex.

As previously found, this alley was not sold to an outside buyer. At best, this was a receivable due from a consolidated subsidiary of BarChris. It should not have been included in the balance sheet, which purported to eliminate intercompany transactions.

### Factor's Reserves

■ Among current assets was an item labeled "Financial Institutions on Notes Discounted" $264,689. This was the amount of the reserves withheld by factors on customers' notes discounted with them by BarChris and consolidated subsidiaries. As the notes were paid by the customer to the factors, the reserves were released proportionately by the factors to BarChris. This was explained in a footnote to the balance sheet.

There is no doubt that this money was an asset of BarChris. There is no attack upon the accuracy of the figure. The claim is that it was not a current asset and should not have been so classified because (1) part of the reserve, in the normal course of events, would not have been released within one year; and (2) some of it might not be released at all, for some of the customers' notes held by the factors were already in arrears. It seems to be true that it could not reasonably be anticipated that all the reserves would be released within one year, as the notes were payable over several years. I believe, therefore, that plaintiffs are correct in their first contention and that this item, in part, at least, should not have been classified as a current asset.

### Work in Progress

■ Next we come to an item under current assets labeled "Charges to customers on contracts in progress (note 2) * * * $1,671,945." Note 2 explained that:

"Charges to customers on contracts in progress represent the approximate sales value of work completed for the year ended December 31, 1960 determined by applying the estimated per-

centages of completed work to the total contract values."

Plaintiffs repeat their contention that the percentage of completion method should not have been employed at all and that nothing should have been included for work in progress. I have already ruled against plaintiffs on this point in discussing the 1960 sales figure.

In addition, plaintiffs say that in any case this was not a current asset. This contention is answered by what I have already said with respect to the $1,157,-973 included in trade accounts receivable. The approximate sales value of the jobs in progress on December 31, 1960 was properly classified as a current asset because it could reasonably be expected that within a year this value would be represented by customers' notes which Bar-Chris could discount and thereby obtain immediate cash.

### Summary

█ Plaintiffs have not established their claim that the BarChris current assets were grossly overstated in the balance sheet. What it boils down to is (1) $145,000 included in cash would more properly have been included in "Investment in Non-consolidated Subsidiary"; (2) current assets should have been reduced by a $50,000 reserve on Federal Lanes; (3) trade accounts receivable were overstated by $150,000 by including Howard Lanes Annex; (4) "Financial institutions on notes discounted $264,-689" should have been treated, at least in part, as a noncurrent asset.

At most, net current assets should have been reduced by the total of these items, $609,689, which would have made them $3,914,332, instead of $4,524,021.

### Contingent Liabilities as of December 31, 1960

Footnote 9 to the balance sheet stated:

"BarChris Construction Corporation in the normal course of its business either accepts customers' installment notes with maturities up to seven years as part payment for products sold and services performed, which notes for the most part are subsequently discounted with financial and other institutions, or sells directly to financial institutions who in turn lease to bowling alley operators (reference is made to the caption 'Method of Operation' in this Prospectus).

"On December 31, 1960 the Company's contingent liability on notes discounted amounted to $3,969,835 (including notes discounted by the finance subsidiary) of which approximately $1,426,756 is due within one year * * *.

"Under the alternative method of financing the Company is contingently liable as of December 31, 1960 in the amount of approximately $750,000, representing 25% of customers' aggregate unexpired rental payments under leases. This contingent liability will decline during the term of the leases which expire in seven years."

Plaintiffs challenge the accuracy of the figures contained in this passage. This contention raises the question of the meaning and effect of certain contracts between BarChris, and BarChris Financial, and Talcott, BarChris's most important, although not its only, factor. These contracts relate to both methods of financing, i. e., (1) the discounting by BarChris and BarChris Financial with Talcott of customers' notes receivable, and (2) the sale and leaseback arrangements known in this case as "the alternative method of financing."

█ As to the first method, Bar-Chris entered into a written agreement with Talcott, on the latter's printed form, under date of August 20, 1958. This contract was modified in certain respects by a letter agreement between them dated June 23, 1960. BarChris Financial entered into a written agreement with Talcott on the latter's printed form on March 16, 1960. This was modified by a letter agreement between them dated June 23, 1960. There is no significant difference between the BarChris agreements and the BarChris Financial agreements. Consequently, for simplicity's sake, this

discussion will be confined to the Bar-Chris agreements. What is said concerning them is equally applicable to the agreements made by BarChris Financial.

Under the first agreement of August 20, 1958, BarChris agreed to sell to Talcott conditional sales contracts, customers' notes, etc., collectively referred to as "customer paper." Talcott agreed to pay BarChris the face amount of this customer paper less a financing charge. Talcott had the right to retain temporarily a small percentage of the purchase price as a reserve, to be released to BarChris from time to time as the notes were paid down by the customer.

BarChris warranted that the customer would pay "each item of customer paper transferred to you." BarChris agreed that if the customer defaulted in payment of "any item," BarChris would repurchase "such item" from Talcott upon Talcott's demand.

The agreement further provided that if BarChris defaulted in performing its obligations under the agreement, then, upon Talcott's demand, BarChris would repurchase "all customer paper then outstanding." If BarChris failed to do so, Talcott had the right to sell the paper at public or private sale.

The agreement was to continue until terminated by either party on sixty days' written notice, or until the insolvency or bankruptcy of either party.

The agreement of June 23, 1960 modified the agreement of August 20, 1958 with respect to BarChris's obligation to repurchase those items of customer paper which "are in default solely by reason of the customer's financial inability to pay the same," (defined as "defaulted customer inability items").

The agreement provided that:

"Until such time as our said agreement is terminated by either party as therein provided, we shall continue liable to you for the repurchase of defaulted customer inability items to the extent of 50% of the total unpaid balances of all items of customer paper accepted by you and not repurchased by us ('total customer outstandings') without reduction by reason of any prior repurchases by us of defaulted customer inability items or other items."

The agreement was not terminated at any time relevant here.

The effect of this amendment was to limit BarChris's contingent liability to repurchase customer paper from Talcott upon Talcott's demand to 50 per cent of the total, as far as "customer inability items" were concerned. As a practical matter, the fact that this amendment applied only to "customer inability items" was immaterial, for in almost every instance, any default on the part of a customer in paying his notes was due to his financial inability to pay.

BarChris's contingent liability on notes discounted, as set forth in footnote 9 to the prospectus in the sum of $3,969,835, was computed by including in this figure, as to notes discounted with Talcott, only 50 per cent of the unpaid balance as of December 31, 1960. This method of computation was correct. The figure was correct. Plaintiffs' contention to the contrary is without merit.

■■■ I turn now to the alternative method of financing with Talcott. This is complicated by the fact that these sale and leaseback arrangements with Talcott took two forms. BarChris's contingent liability was not the same in each.

The first form (referred to for convenience as Type A) involved the sale of the "interior" of an alley by BarChris to Talcott and the leasing of the interior by Talcott directly to BarChris's customer. The second (Type B) involved the sale of the interior by BarChris to Talcott, the leasing back of the interior by Talcott to a BarChris subsidiary, BarChris Leasing Corporation, and the lease of the interior by BarChris Leasing Corporation to the customer.

As to each Type A arrangement, BarChris signed and delivered to Talcott a written guaranty of the customer's, i. e., the lessee's, performance under the lease from Talcott. In each instance, this

guaranty contained a limitation of Bar-Chris's liability thereunder to a specified dollar amount. Although the guaranties did not expressly so state, in fact this dollar amount, in each instance, was 25 per cent of the customer's total obligation under the lease.

In Type B arrangements, BarChris executed and delivered to Talcott a written guaranty of the performance of BarChris Leasing Corporation under its lease from Talcott. The obligation of BarChris under its guaranty was not limited in any way. Thus, BarChris was contingently liable to the extent of 100 per cent for the performance by BarChris Leasing Corporation of its obligation under its lease.

Footnote 9 to the balance sheet, in stating that BarChris's contingent liability as of December 31, 1960 under the alternative method of financing was approximately $750,000, failed to take account of this difference. The $750,000 figure was computed on the basis of 25 per cent of the lessee's obligation under the lease, regardless of whether the lessee was a customer or was BarChris Leasing Corporation.

There were three Type B leases included in this computation, those involving Asbury Lanes, Yankee Lanes (Torrington), and Capitol (Heavenly). The obligation of Torrington was $320,627.50 and of Asbury $288,766.68, a total of $609,394.18. This was the amount of BarChris's contingent liability on these two leases, not 25 per cent thereof, or $152,348.54. BarChris's contingent liability was thus understated as to these two leases by $457,045.64.

The situation as to Capitol (Heavenly) is different and worse. The amount of its lease obligation was $325,000. Capitol was not leased by BarChris Leasing Corporation to an outside customer. It was leased to a BarChris subsidiary. This was an inter-company transaction. Consequently, in this instance BarChris,

on a consolidated basis, was directly, not contingently, liable. Hence, instead of including 25 per cent of this $325,000 in contingent liabilities in a footnote, the full $325,000 should have been reflected in the balance sheet as a direct liability of BarChris.[9]

Apart from the figures, the statement in footnote 9 reading, "This contingent liability will decline during the term of the leases which expire in seven years," was not wholly accurate. As to Type A transactions, inasmuch as BarChris's contingent liability on its guaranty of the customers' leases was expressed in terms of a fixed dollar maximum, there would be no decline in that liability until the customer's obligation was reduced by payments to a sum less than that maximum.

For convenience, I will refer at this point to two remarks in the text of the prospectus which relate to this subject.

In describing the alternative method of financing, the prospectus states on page 6:

> "[W]hen the financial institution leases directly to the operator, the Company's contingent liability to the financial institution is limited to 25% of the operator's rental payments for the unexpired period of the lease."

This statement is literally correct, but it is only part of the story. It describes only BarChris's contingent liability on Type A transactions. There is no mention of the fact that on Type B transactions BarChris's contingent liability is 100 per cent. The omission of this additional explanation makes the prospectus to some extent misleading.

█ Also on page 6 the prospectus states:

> "As of December 31, 1960, the Company had completed and sold ten building interiors for an aggregate price of $2,271,000 under this alternative method of financing."

9. Similar errors were made in computing the contingent liability figure as of April 30, 1961 which appears on page 6 of the prospectus. This will be discussed hereinafter.

This statement also was not wholly accurate. As of December 31, 1960, BarChris had sold nine building interiors, not ten. Also, one of them, Torrington, was not yet finished as of that date, so that it was not "completed and sold." By May 16, 1961, however, BarChris had sold ten building interiors. In fact, the total was then eleven, if two Cromwell jobs are counted separately. Also by May 16, Torrington had been completed. The inaccuracy in the statement as of December 31, 1960 is *de minimis*.

### Summary

The net result is as follows:
*Add* to contingent liabilities:

| | |
|---|---|
| 3/4ths of liability on Asbury and Torrington | $457,045 |
| *Deduct* Capitol: | 81,250 |
| Net understatement of contingent liability | $375,795 |

Hence, instead of $750,000, the contingent liability figure under the alternative method of financing should have been $1,125,795. Capitol should have been shown as a direct liability in the amount of $325,000.

### Reserves

■ Plaintiffs also criticize the reserves, or lack of them, in the balance sheet. First, they claim that the reserve for doubtful accounts receivable in the amount of $54,481 was inadequate.

"Accounts receivable" in this context means indebtedness of customers which had not as yet been paid by delivery by the customer to BarChris of notes which BarChris could discount with a factor. The $54,481 covered such accounts which were more than ninety days past due on December 31, 1960. Up to that time BarChris's experience had been good, on the whole, in converting accounts receivable into discountable notes.

The amount of such reserve is a matter of accounting judgment. The evidence does not convince me that the accountant's judgment here was so clearly wrong that the balance sheet can be found to be false or misleading for lack of a higher reserve.

■ Plaintiffs also claim that BarChris should have set up a reserve against its contingent liability on customers' notes discounted with factors and on customers' leases guaranteed. Some of these notes were in default on December 31, 1960. The factors however, had not demanded that BarChris repurchase any of them. Talcott contented itself with sending notices to BarChris periodically advising it that certain accounts were in arrears and asking BarChris's "assistance" to "bring these accounts up to date."

According to Talcott's records, on December 31, 1960 there were eleven customers out of forty who were behind in paying their notes. For the most part, the amounts involved were small. Five were under $5,000. Only three were over $10,000. Of these, only one, Federal, was over $20,000. None of the lessees was behind in his rent.

Another factor, Henry W. T. Mali & Co., Inc. (Mali), with whom the notes of four customers had been discounted by BarChris Financial, reported that of the four, one, Northford Lanes, was in arrears. BarChris apparently had paid these arrears to Mali for Northford's account.

I have already discussed Federal, which is a special case. The question is whether, apart from Federal, it was misleading to omit any reserve for all the other contingencies.

The executive committee minutes show that as early as November 3, 1960, Russo had expressed the opinion that BarChris "would be in the business of operating bowling alleys sometime in the future because of defaults by some of our customers." This remark provoked a discussion which led the executive committee to conclude that if BarChris were forced to take over the operation of a customer's alley, "the least which can be expected is that the notes to BarChris would be met from the operation." In other words, BarChris's officers in No-

vember 1960 believed that recapture of an alley would not cause a loss to Bar-Chris. They believed that BarChris would be able to meet its obligations to Talcott with respect to such a repossessed alley.

As events ultimately turned out, Bar-Chris was forced to repossess a number of alleys, and the optimism of its officers in November 1960 as to the effect on BarChris did not prove to be justified. In the light of the subsequent events, it is easy to say that prudence would have dictated the establishment of some reserve as of December 31, 1960. But these matters are always more clearly discerned in retrospect than they are at the time. In my opinion, BarChris's officers were sincere in their belief at the end of 1960 that BarChris was in no real danger of loss from customers' defaults. Apart from Federal, I conclude that their belief, viewed as of that time, was reasonable. The evidence does not establish that the balance sheet as of December 31, 1960 was false or misleading for lack of a reserve against contingent liabilities.

### The 1961 Figures

The prospectus sets forth on page 4 the amount of BarChris's net sales, gross profits and net earnings for the three months ended March 31, 1961, in the amounts of $2,138,455, $483,121, and $125,699, respectively. These figures were unaudited, as the prospectus stated. On page 6 the prospectus set forth $5,-101,351 as the amount of BarChris's contingent liability as of April 30, 1961 on customers' notes discounted, and "approximately $825,000" as its contingent liability under the alternative method of financing. Plaintiffs challenge the accuracy of these figures.

### Contingent Liabilities as of April 30, 1961

The issue here is essentially the same as that previously discussed with regard

to the contingent liability figures as of December 31, 1960. The April 30, 1961 figures were prepared by Trilling. The figure for contingent liability on notes discounted was correctly computed on the basis of 50 per cent of the unpaid balance of notes discounted with Talcott.

As to the alternative method of financing, Trilling merely took the December 31, 1960 figures and brought them down to date, adding new leases made in the meantime and reflecting intervening payments of rent. The same error was made as to Type B leases, i. e., only 25 per cent of the lessee's obligation was included for Asbury and Torrington, instead of 100 per cent, and 25 per cent was also included for Capitol, an intercompany transaction. In addition, the April 30, 1961 figures included a new lease to BarChris Leasing Corporation dated March 23, 1961 with respect to Olympia Lanes. This was also a Type B transaction. Therefore, the full amount of the lessee's obligation, rather than 25 per cent thereof, should have been included.

The net result is as follows:

| *Add:* | Asbury | $207,612.51 |
|---|---|---|
| | Torrington | 234,182.64 |
| | Olympia | 255,600.00 |
| | Total | $697,395.15 |
| *Deduct:* | Capitol | $78,541.67 |
| Net Understatement of Contingent Liability on Type B Transactions | | $618,853.48 |

Instead of $825,000, the contingent liability on the alternative method of financing was at least $1,443,853. Moreover, the liability of $314,166 on Capitol was a direct liability, not a contingent one.[10]

---

10. Quite distinct from this matter of the errors in computing the amount of Bar-Chris's contingent liabilities, the question arises as to whether the situation with respect to customers' arrears had deteriorated to such an extent since December 31, 1960 as to require its disclosure in the prospectus. This subject will be considered hereinafter in the discussion of that portion of the prospectus which referred to BarChris's previous favorable experience in collecting customers' notes.

### Net Sales, Gross Profit and Net Earnings

Plaintiffs correctly contend that the net sales of $2,138,455 for the three months ended March 31, 1961 were overstated.

This figure included $269,810 for Bridge Lanes. I have previously noted that the stock of the original customer for this alley, Biel Land & Development Company, was acquired by BarChris in the spring of 1961. The date of acquisition was March 24, 1961. Subsequently, BarChris operated this alley through a subsidiary. Once it began to operate it, it did not sell it at any time thereafter, as far as appears. There is no doubt that by March 31, 1961, this transaction had become an intercompany one. It should not have been included in first quarter 1961 sales.

Yonkers Lanes is in the same category. The amount included in sales for this alley was $250,000. On May 4, 1961, BarChris organized a subsidiary, Yonkers Lanes, Inc., which eventually operated this alley. Whether BarChris originally had intended to operate it, or whether at the outset it had a customer for it, is not clear from the testimony. However, the minutes of a meeting of BarChris's executive committee held on March 18, 1961 show that as of that date BarChris had no contract with a customer for this alley. It seems clear that by March 31, 1961 this was an intercompany transaction and should not have been included in first quarter sales.

I do not accept plaintiffs' contention that the contract price of Cromwell Lanes of $91,100 included in the first quarter sales was wrong. Plaintiffs say that the contract price had been reduced by $9,600. I find, however, that the $9,600 shown on BarChris's books as "pre-paid rent," was in effect a down payment on the contract price. The price was not reduced. The amount included in sales for this alley was correct.

I also find that plaintiffs have not proved that the amounts included in first quarter sales, on the percentage of completion method, for Torrington Lanes and Newington Lanes were improperly computed. Although there is some evidence to the effect that the costs of these jobs eventually turned out to be higher than expected, the evidence is too scanty to prove that this should have been anticipated and allowed for in computing the first quarter figures.

The net result is that the March 31, 1961 net sales figure was overstated as follows:

| | |
|---|---|
| Bridge Lanes | $269,810 |
| Yonkers Lanes | 250,000 |
| Total | $519,810 |

The net sales figure, therefore, should have been $1,618,645, not $2,138,455.

It necessarily follows that the gross profit figure of $483,121 was wrong to the extent of the gross profit included for Bridge Lanes and Yonkers Lanes. These amounts were:

| | |
|---|---|
| Bridge Lanes | $125,755 |
| Yonkers | 105,000 |
| Total | $230,755 |

The gross profit therefore should have been $252,366, instead of $483,121. Net earnings would necessarily be reduced proportionately. The evidence does not permit calculation of the exact amount of the reduction.

### "Backlog" as of March 31, 1961

The prospectus stated on page 5:

"The Company as of March 31, 1960, had $2,875,000 in unfilled orders on its books. As of March 31, 1961, the comparable amount was approximately $6,905,000. Substantially all of the latter orders are scheduled and are expected to be completed in 1961."

Plaintiffs contend that the figure of $6,905,000 was erroneous. There is no doubt that it was, to a substantial extent. It is impossible to determine, however, precisely what the figure should have been.

The difficulty results from the fact that BarChris's books did not contain a

record of unfilled orders as of March 31, 1961. Russo testified that he prepared a list of them which was the basis for the figure in the prospectus. The list was never produced. Its absence gave rise to controversy as to what alleys were on the list and what were not. Despite all the testimony and argument on this subject, the matter was never completely settled.

Out of all this testimony, however, some things clearly emerge. Although it is not possible to specify each and every alley which was included in the total of $6,905,000, there is no dispute about the fact that certain alleys were included. And it is clear that alleys were included for which BarChris, as of March 31, 1961, held no valid enforceable contracts.

### T-Bowl

I shall first consider the group of six alleys referred to as the "T-Bowl" group. The principal figure in these transactions was August E. Tumminello. In December 1960 or January 1961, he, at the urging of Vitolo, signed six undated documents on BarChris's printed form of purchase contract. The name of the purchaser at the head of the respective documents was stated as "T-Bowl, Groton," "T-Bowl Milford," "T-Bowl, No. Attleboro," "T-Bowl Baltimore," "T-Bowl Saverna Park," and "T-Bowl Odenton." On five of the six documents the same name appeared after the word "Purchaser" at the bottom, followed by the signature, "August E. Tumminello Pres." On the sixth, that pertaining to North Attleboro, nothing appeared at the bottom after the word "Purchaser" except Tumminello's signature as "Pres."

In fact, there were no corporations entitled T-Bowl Groton, T-Bowl Milford, etc. These names were merely designations of the geographical area of the proposed alley.

Each of these "purchase contracts" purported to be for the "interior" of an alley. Each stated that the "purchaser" agreed to purchase "the equipment set forth below." Nothing was set forth below. Each document stated that "speci-fications are attached." No specifications were attached. Each recited that a specific part of the purchase price had been paid upon the signing of the contract. Nothing was paid at that time.

Birnbaum, BarChris's secretary and house counsel, advised his fellow officers that these documents were not legally enforceable contracts. The minutes of BarChris's executive committee meeting of March 18, 1961 included each of these alleys in a list of "jobs which are presently being constructed, or will soon be commenced, and on which no contracts with customers have been written."

On May 2, 1961, a corporation known as T-Bowl International Inc. was organized. Tumminello was its president. Russo was a director. This corporation sold common stock to the public in September 1961. The issue was underwritten by Peter Morgan & Company, one of the underwriting group in the BarChris debenture issue involved here. The T-Bowl prospectus stated:

> "At June 30, 1961, T-Bowl had consolidated negative working capital of $229,058.79 * * *."

This financing appears to have succeeded. Out of its proceeds T-Bowl International Inc. finally made the down payments to BarChris with respect to the six T-Bowl jobs. Birnbaum caused a line to be drawn through the name of the purchaser on each of the six documents, i. e., T-Bowl Groton, etc., and the words "T-Bowl International Inc." to be written in in ink. The documents were not reexecuted.

Five of the six alleys were eventually built by BarChris, long after May 16, 1961. One, Severna Park, was never built because its site was condemned for a highway.

██ It is undisputed that the total contract price of these six alleys, $2,205,000, was included in the backlog figure. I find that it was inaccurate and misleading to include it.

I have made due allowance for the fact that BarChris's contract draftsmanship was frequently inartistic. Consequently,

I do not regard as determinative the fact that the T-Bowl documents were carelessly drawn and executed. But the difficulty here goes beyond such defects in form. The evidence shows, and I so find, that Tumminello's agreement made in late 1960 or early 1961 to purchase the interior equipment of the six alleys was contingent upon the future organization and successful financing of the corporation which turned out to be T-Bowl International Inc. Whether or not this could ultimately be accomplished was by no means certain on March 31, 1961. Indeed, one may wonder how purchasers were found in September 1961 for the stock of a new corporation starting out in life with a "negative working capital of $229,058.79."

Doubtless BarChris's officers in the spring of 1961 hoped that this could be accomplished. But the prospectus did not purport to set forth hopes. "Unfilled orders on its books" which are "scheduled" means firm enforceable contracts with purchasers who have made their down payments and who can reasonably be expected to perform their commitments. The six T-Bowl orders did not meet that test. The fact that, as it eventually turned out, five of the six transactions were consummated, does not alter the conclusion that they could not fairly be treated as scheduled orders on BarChris's books as of March 31, 1961.

### Bowl-a-Way

It is undisputed that $1,400,000 was included in the backlog figure for this alley. The contract for its construction was not signed until August 9, 1961. BarChris never finished building it.

As of March 31, 1961, there was no firm commitment with respect to this transaction. There had been negotiations, but agreement had not been reached on financing terms. A BarChris memorandum dated April 24, 1961 and the BarChris executive committee minutes of the same date so indicate. It was inaccurate and misleading to treat this transaction as a scheduled unfilled order on the books as of March 31, 1961.

### Woonsocket

It is undisputed that $725,000 was included in the backlog figure for this job. There is testimony that Bar-Chris made a contract in 1960 with a purchaser for this alley and that the purchaser later cancelled the contract. The contract was never produced and the date of cancellation was never specified. The minutes of BarChris's executive committee meeting of March 18, 1961 lists this job as one of those which was then or about to be under construction without a contract.

BarChris built this alley and operated it itself. At the end of 1961 it was eliminated from 1961 sales because it was an intercompany transaction. I find that it was inaccurate and misleading to include it in the backlog figure.

### Atlas-Lincoln

It is undisputed that $160,000 was included in the backlog figure for this alley. The contract was not signed until May 11, 1961. The purchaser made a down payment of $8,000 with a post-dated check. Later this payment was returned to him and the contract was cancelled. The alley was never built. Whatever BarChris's hopes may have been on March 31, 1961, there was no firm enforceable commitment for this job on that date. I find that it was erroneous and misleading to include it in the backlog figure.

### Other Alleys

I have considered plaintiffs' contentions that certain other jobs which it appears were included in the backlog figure should not have been included. These are: Max Block, T-Bowl Middletown, and the buildings for T-Bowl Milford and T-Bowl Groton (which are transactions separate from those involving the interiors of those alleys which I have previously discussed). The evidence on these transactions is conflicting. I shall not review it in detail here. Upon all the evidence I find that plaintiffs have not proved their contention that these alleys were improperly included in

the backlog figure, viewing their status as of March 31, 1961.

I have also considered plaintiffs' contentions with respect to Newport News, Norfolk and Atlas-Bedford. It is clear that these transactions should not have been included in the backlog, but it is not clear that they were. On all the evidence, I find that plaintiffs have not established that any amount for these transactions was in fact included in the backlog.

By way of summary, I find that the following amounts for the following transactions were erroneously included in the backlog figure:

| | | |
|---|---|---|
| Six T-Bowl interiors | | $2,205,000 |
| Bowl-a-Way | | 1,400,000 |
| Woonsocket | | 725,000 |
| Atlas-Lincoln | | 160,000 |
| | Total | $4,490,000 |

In stating that unfilled orders on BarChris's books as of March 31, 1961 were approximately $6,905,000, the prospectus was false. The figure at best should not have been more than $2,415,000. This was less than the amount of unfilled orders on hand at the corresponding date in the previous year, March 31, 1960, which, according to the prospectus, was $2,875,000.

### The Text of the Prospectus

Up to this point I have considered inaccuracies in the figures set forth in the prospectus, sales and earnings, assets, contingent liabilities, and backlog. Apart from these, plaintiffs contend that there were inaccuracies in certain passages in the text. I will deal with each of the principal contentions on this score.

### Officers' Loans

■ The following passage appeared on page 10 of the prospectus:

"During the three years ending February 28, 1961, the Company from time to time made advances to the officers of the Company, and the officers of the Company from time to time made advances to the Company and its subsidiaries for additional working capital. The maximum amount of such advances by the Company to such officers outstanding at any one time during such period was $87,073, and the corresponding maximum amount of advances by the officers was $155,615. All such advances have been repaid."

There are three things which could be said to be wrong with this paragraph:

1. The three-year period referred to should not have been the three years ending on February 28, 1961, but rather the three years ending on March 13, 1961, or, if one prefers, on March 31, 1961.

2. The $155,615 referred to as the maximum amount of advances made by officers to BarChris during the three-year period had not in fact been repaid.

3. In any event, as of May 16, 1961, the effective date of the prospectus, there were additional advances by officers which had not been repaid and the existence of which should have been disclosed.

The evidence shows without substantial contradiction that the first and the third of these points are well taken. The second depends upon questions of credibility. The relevant facts are as follows.

As of March 12, 1961, BarChris was indebted to three of its officers for loans made by them to BarChris in the following amounts:

| | | |
|---|---|---|
| Russo | | $ 44,000 |
| Vitolo | | 51,615 |
| Pugliese | | 60,000 |
| | Total | $155,615 |

This is the maximum figure stated in the prospectus.

On March 13, 1961, BarChris delivered to each of these officers checks in the amount of their respective advances. The checks were drawn on BarChris's account in Lafayette National Bank. Russo deposited his check for $44,000 on April 18, 1961. Vitolo deposited his check for $51,615 on May 31, 1961. Pug-

liese deposited his check for $60,000 on May 26, 1961.

Thereafter on April 11, 1961, Russo made a new loan to BarChris in the amount of $75,000, and on April 14, 1961 he made another advance in the amount of $100,000, making a total of $175,000. On April 24, 1961 Vitolo loaned BarChris $100,000. Practically simultaneously with the receipt of these advances, BarChris delivered to Russo and Vitolo its checks to their respective orders in the same amounts. Thus BarChris delivered to Russo a check for $75,000 on April 11, 1961, and a check to him for $100,000 on April 17, 1961. BarChris delivered to Vitolo a check to his order for $100,000 on April 24, 1961. These checks were drawn on BarChris's account in Lafayette National Bank. There was not enough money in the account in that bank to pay them.

When he delivered these checks, Kircher instructed Russo and Vitolo not to deposit them until after BarChris had received additional funds. The proceeds of the debenture issue were received on May 24, 1961. Russo deposited his two checks on May 29. Vitolo deposited his on May 31. By that time enough of the proceeds of the financing had been placed in the Lafayette National Bank account to cover the checks.

As to the first of the three points previously mentioned, it is obvious from these facts that the date of February 28, 1961 set forth on page 10 of the prospectus was an error. On any theory, the first set of loans totalling $155,615 had not been repaid by that date. Apparently by inadvertence the draftsmen of the prospectus failed to make the date March 13, 1961, or the end of the quarter, March 31, 1961, a date which would have been just as accurate as March 13, or just as inaccurate, depending upon the view one takes of the March 13 transactions. The error in date, however, is not in itself of any great significance.

Deferring for the moment consideration of the second of the three points, I will pass to consider the third. There

is no doubt that the second set of loans made in April, totalling $275,000, had not been repaid by May 16. The delivery of checks to Russo and Vitolo by BarChris under the circumstances recounted above did not constitute repayment at the time of delivery. I find that Russo and Vitolo agreed not to deposit their checks until after the financing proceeds were received. The loans were not repaid until after May 24 when the receipt of the financing proceeds by BarChris made repayment possible.

It is suggested that, nevertheless, as far as this second set of loans is concerned, the prospectus was not false in stating that "all such advances have been repaid." It is argued that "such advances" referred only to the first set of loans, not to the second. This is a highly literal reading. It can more fairly be said that "such advances" refers to all advances by officers, not merely to certain particular ones, and hence that when the prospectus said that "all such advances" had been repaid, it in effect represented that no loans from officers were outstanding and unpaid as of the effective date, May 16, 1961. So construed, the statement in the prospectus was false. Even if the more literal construction is adopted, so that the prospectus is read as though it had actually said "the $155,615 has been repaid," it is clear that candor and fair disclosure required that the prospectus reveal that although one set of officers' loans had been repaid, there was outstanding another and larger amount of such loans which had not been repaid. The failure to make this disclosure was misleading.

I return now to the second point. Was it true that at least the $155,615 had been repaid, or was that statement also false? This depends upon whether or not the delivery by BarChris to Russo, Vitolo and Pugliese on March 13 of checks totalling $155,615 was also a conditional delivery. I find that it was. There is testimony to the effect that the delivery on March 13 was not conditional, that no strings were attached to the deposit of these checks. I do not believe it. I do not be

lieve that a man like Vitolo or Pugliese would hold a check for some $50,000 or $60,000 approximately two and one-half months without depositing it unless he had agreed to hold it for reasons which he considered sufficient. I do not overlook the fact that Russo deposited his check on April 18. Either Russo made no such agreement, or if he did, he failed to keep it, as Vitolo and Pugliese kept theirs.

Certain other facts may be noted. The balance in the Lafayette National Bank account fluctuated widely. On March 13, 1961 it was approximately $80,000. Although there were times thereafter when the balance temporarily exceeded $155,615, for the most part it was below that figure, often substantially below it. Moreover, a BarChris work paper contained an entry reading "checks released 5/24/61—$399,615.36." This total includes not only the April checks, but also the March 13 checks to Vitolo and Pugliese. If this entry is true (and there is no reason to doubt it), obviously the checks were not "released" on March 13.

On all the evidence, I find that the Vitolo loan of $51,615 and the Pugliese loan of $60,000 were not repaid prior to May 16, 1961. Of the $155,615, only Russo's loan of $44,000 had been repaid prior to that date. It follows that the statement in the prospectus that officers' loans totalling $155,615 had been repaid was false.

The prospectus impliedly, if not expressly, represented that there were no loans from officers outstanding as of May 16, 1961. In fact there were then outstanding and unpaid loans from officers in the aggregate amount of $386,615. BarChris paid this amount after May 22, 1961 out of the proceeds of the debenture issue.[11]

*Application of Proceeds*

■ The prospectus states on page 2:

"The net proceeds from the sale of the Debentures offered hereby ('the Debentures') will be added initially to the general funds of the Company. Approximately $750,000 has been budgeted for construction of a new plant described under 'Property' herein. It is anticipated that approximately $250,000 will be utilized in connection with the development of a new equipment line which includes ball return units, score projection equipment, ball cleaning equipment and related items and approximately $500,000 will be loaned to BarChris Financial Corporation as described under 'Subsidiary Companies.' The balance of such net proceeds, or approximately $1,745,000, will be utilized as additional working capital in the expansion of alley construction and installation and supplies and equipment sales. The Company's working capital requirements have risen sharply over the past several years. If this trend continues, the entire balance of such net proceeds will be required for this purpose. Pending such need the Company will be in a position to retain a portion of its customers' paper or to make investments in short term securities."

Plaintiffs contend that this passage was false. They maintain that BarChris did not intend to use the proceeds of the financing for the purposes stated in this paragraph, and that in fact BarChris did not use them for those purposes. Proper appraisal of this contention requires examination of BarChris's financial condition in May 1961 and of certain events which occurred thereafter.

11. In addition to the loans from Russo, Vitolo and Pugliese which I have discussed in detail, there was a loan to BarChris in the amount of $13,000 from a corporation known as B.C.L. Realty, a company which Russo, Vitolo and Pug-liese are alleged to have controlled. Since the testimony on this subject was not very definite, I have not included this in the total of loans outstanding from officers.

In May 1961 BarChris was very short of cash. This was more or less a chronic state of affairs for BarChris, but it was particularly acute at this moment. It was because of BarChris's urgent need for cash that Russo, Vitolo and Pugliese each lent it substantial sums out of their own funds. In addition to borrowing from its officers, BarChris had also borrowed $242,000 from Manufacturers Trust Company.

Immediately prior to May 24, 1961, BarChris had four bank accounts—in Lafayette National Bank, Meadow Brook National Bank, Chase Manhattan Bank and Manufacturers Trust Company. The Lafayette account was the principal one. According to the bank statement, the balance in that account on May 16, 1961 was $87,049.41 and on May 24, 1961, immediately before BarChris received the proceeds of the financing, it was $21,241.38. But these figures by no means reveal the true situation. According to BarChris's books, there was actually a very substantial "negative cash balance" in this account. This means that if all the checks which BarChris had signed and charged against this account on its books had been presented to the bank, the account would have been overdrawn to the extent of $656,146 on May 16, and $825,736 on May 23.

A substantial part of this "negative balance" was made up of the checks delivered to Russo, Vitolo and Pugliese which, as we have seen, they agreed to hold without depositing. These aggregated $386,615. There was also the $13,000 check to B.C.L. Realty, which may well have been in the same category. There was a check to Peat, Marwick in the amount of $3,000, and one to Perkins, Daniels, McCormack & Collins, BarChris's attorneys, in the amount of $8,711. These items total $411,326. The difference between this figure and $825,736, i. e., $414,410, was the aggregate amount of certain checks which BarChris had signed and charged against the bank account on its books but had not delivered to the payees. These checks were in payment of bills for materials or services furnished to BarChris by various third persons in the course of BarChris's construction work.[12]

The amounts on deposit in the other three bank accounts were modest, according to the bank statements. The balances at the date nearest to May 23, 1961 which the bank statements reflected were as follows:

| Meadow Brook | May 4 | $ 218.71 |
| | May 31 | 2,718.71 |
| Chase Manhattan | May 23 | 10,108.94 |
| Manufacturers Trust Company | May 15 | 50,521.37 |
| | June 1 | 1,521.37 |

The evidence does not indicate whether the same situation obtained with respect to these accounts as with respect to the Lafayette account. It may well be that it did, and that even these small balances, as shown by the banks' records, would have been converted into "negative" ones if checks actually drawn against these accounts, but not delivered to the payees, were taken into account.

12. It was apparently BarChris's custom to write checks, sign them, charge them on its books, and then hold them without delivery to the payee until there was enough money in the bank to cover them. It is said that this premature bookkeeping was done as a matter of convenience in using an automatic check writing machine which could write a number of checks all at one time.

BarChris received the net proceeds of the financing on May 24, 1961. They amounted to $3,302,298.65. BarChris deposited this sum in a new account in Irving Trust Company. It immediately drew a check for $760,000 against this account and deposited it in Lafayette National Bank on May 24. Further transfers were made shortly thereafter. The transfers totalled $1,379,000.

Out of the funds so transferred, the entire "negative cash balance" of $825,736 in the Lafayette account was paid. This included the officers' loans. Also, out of these funds BarChris repaid the $242,000 which it had borrowed from Manufacturers Trust Company. Finally, out of these funds, BarChris loaned $120,000 to St. Ann's, Inc., a company with which associates of Tumminello and Russo were connected.[13]

The total of the officers' loans (not including B.C.L. Realty) and the Manufacturers Trust Company loan was $628,615. It is clear that in the first instance, at least, BarChris used a substantial part of the financing proceeds in a manner not revealed in the prospectus, i. e., to pay its debts. It also used over $400,000 more of the proceeds to pay construction expenses incurred before May 23, 1961. And it used $120,000 of the proceeds to make a loan to Russo's friends. The question is whether or not by reason of these facts the "application of proceeds" paragraph in the prospectus was false or misleading.

Defendants say that it was not misleading because BarChris later received additional funds from customers which were used for the purposes specified in the prospectus. Their position is that if the financing proceeds are to be considered a fund of "working capital" to be applied in certain specified ways, that fund was later reimbursed, so to speak, by these additional receipts, so that it makes no real difference that initially, a substantial portion of the proceeds was applied in a manner not contemplated by the prospectus.

It is true that BarChris did continue in business for over a year, it did build alleys and receive payments from customers, and it managed for a time to pay construction costs. It is also true that eventually BarChris did build the new plant mentioned in the prospectus, and it seems to be true that BarChris developed the new equipment line referred to in the prospectus. At least, plaintiffs have not proved the contrary. As to the $500,000 to be loaned to BarChris Financial, according to the prospectus, it is true that BarChris did make this loan. Within a month, however, BarChris Financial paid it back to BarChris, presumably because BarChris needed the money. It is arguable, at least, that such a temporary loan was not what the prospectus contemplated.

But apart from all this, it was not practicable, in the present condition of BarChris's records, to prove, and defendants did not prove, that BarChris eventually received from other sources and expended in alley construction enough money fully to replenish its working capital for the large expenditures which BarChris had made out of the financing proceeds immediately after it received them. In view of the collapse that eventually occurred, it seems most unlikely that it did.

The fundamental fact is that in May 1961 BarChris was so hard pressed that it borrowed over $600,000 and held up payments to construction creditors totalling more than $400,000. It used the financing proceeds to pay these obligations totalling over $1,000,000. It used $120,000 more to assist St. Ann's. There is no doubt that in May 1961 BarChris's officers intended so to use the proceeds.

There is no hint of this situation in the prospectus. According to the prospectus, $1,745,000 of the proceeds (the amount remaining after defraying the costs of the new plant, the new equipment line and the loan to BarChris Financial) was to be utilized as "additional" working capital in the "expansion" of alley con-

---

13. This $120,000 loan was eventually repaid to BarChris.

struction. There is not the faintest suggestion that over 60 per cent of this sum would be immediately expended in other ways, primarily in paying prior debts incurred as a result of alley construction already undertaken. I cannot escape the conclusion that in failing to reveal these facts, the prospectus was false and misleading. I so find.

### Customers' Delinquencies in 1961

 After describing BarChris's practice of discounting notes with factors, the prospectus stated on page 5:

"Since 1955, the Company has been required to repurchase less than ½ of 1% of such promissory notes discounted by such unaffiliated financial institutions."

Plaintiffs contend that this statement was false, and that in any event the prospectus was misleading because of its failure to advert to the difficulties which confronted BarChris in May 1961 by reason of the failure of some of its customers to pay their notes which BarChris had discounted with Talcott. The relevant facts are as follows.

The customer delinquency problem was much more serious in May 1961 than it had been in December 1960. It had been growing more serious for some time. At a BarChris executive committee meeting on February 27, 1961, Russo not only mentioned his troubles with Federal Lanes, a perennial delinquent, but he also pointed out that Stratford Bowl was four months in arrears on its payments to Talcott, that six notes of Northford Lanes were due and unpaid, that Leader Lanes was six months behind in its payments, and that the owners of Howard Lanes had said that they could not pay any more notes.

Russo frequently discussed these problems with Talcott and attempted to allay any apprehensions that Talcott might have. By April, Talcott was no longer willing to content itself with sending to BarChris periodic notices of its customers' arrears. On April 21, 1961, Talcott wrote to Russo confirming their discus-

sions as to four of the worst offenders, Dreyfuss Bowl (Harlem), Stratford, Leader and Federal. As to Dreyfuss, the letter stated that Talcott would retain counsel on BarChris's behalf to repossess the alley and that in the meantime Bar-Chris must pay Talcott $9,737.41 "as a special reserve toward the repurchase of this account." As to Stratford, BarChris was to pay $22,100 as a similar reserve against repurchase. As to Leader, Talcott would expect BarChris to repossess the alley unless Leader paid $11,266.64 by April 24. As to Federal, Talcott stated that if $5,000 were not received by April 24, BarChris must repossess the alley.

This letter further expressed Talcott's understanding, based on conversations with Russo, that BarChris intended to form an operating company to operate these four alleys, plus a fifth, Hart Lanes, and to make, on their behalf, the payments due from them currently to Talcott. The letter pointed out that this would deviate from Talcott standard procedure of requiring the repurchase of delinquent accounts, i. e., requiring Bar-Chris to repurchase all the notes of a defaulting customer. Talcott refused to commit itself not to insist on this standard procedure.

Thus, by April 21, 1961, BarChris knew that it might be faced with a demand to repurchase all the notes of Dreyfuss, Stratford, Leader and Federal. These aggregated more than $1,350,000. Obviously, BarChris was in no position to comply with any such demand.

Further discussions and negotiations ensued. It is clear that Russo informed Talcott of the forthcoming debenture financing and it is highly probable that he emphasized to Talcott the improvement which the consummation of this financing would bring about in Bar-Chris's cash situation.

On May 5, 1961 Talcott wrote to Russo stating that four accounts, Dreyfuss, Stratford, Leader and Federal, "are eligible for repurchase under the terms of our agreement," that Talcott wanted to receive the sums mentioned in its letter of

April 21 "as a token beginning toward eventual repurchase in full of the accounts in question," and that Talcott "cannot condone any further delays in starting a reasonable program to clear these defaulted accounts."

Russo continued to negotiate. He and Kircher met with Talcott on May 16, 1961 (the very day that the registration statement became effective). The results were embodied in Talcott's letter of May 17. That letter was mainly devoted to Stratford and Dreyfuss. As to Stratford, Talcott agreed to refrain from demanding that BarChris repurchase all Stratford's notes provided that BarChris took over the operation of Stratford and paid to Talcott all Stratford's arrears. As to Dreyfuss, Talcott agreed "to forego a request for immediate repurchase," provided that BarChris paid all arrears plus a specified reserve. Talcott expressed its feeling that "if the Dreyfuss situation is not turned around by August 15," BarChris should repurchase all Dreyfuss' notes.

The net amount demanded by Talcott in this letter, after giving certain credits to BarChris, was $34,329.78. On May 26 Russo called Talcott to tell Talcott that BarChris "had gotten their money on May 24." On June 5 BarChris paid the $34,329.78 to Talcott.

Talcott advised Russo that Talcott did not "want any more metropolitan bowling paper," but that it "would look at deals elsewhere in the nation." In fact, Talcott did not discount any more notes of BarChris's customers, metropolitan or otherwise, after April 1961.

Dreyfuss went into bankruptcy in May 1961. Stratford and Federal also went into bankruptcy. BarChris eventually repossessed these alleys and a number of others, including Leader. By May 1962 BarChris was operating thirteen alleys,

some of which it had repossessed from defaulting customers and others of which, such as Capitol, Bridge, Woonsocket, etc., it had operated from the beginning.

What is the effect of these facts on the issue of the truth or falsity of the statement in the prospectus that "since 1955, the Company [BarChris] has been required to repurchase less than ½ of 1% of such promissory notes discounted by such unaffiliated financial institutions"?

As far as the evidence shows, this statement was true with respect to the period from 1955 to April 1961. But the prospectus spoke as of May 16, 1961. The question is whether the statement continued to be true down to that date. The answer depends upon the interpretation to be given to the facts which I have recounted.

There is no doubt that the outstanding notes of the four customers, Dreyfuss, Stratford, Leader and Federal, substantially exceeded in the aggregate one-half of one per cent of all promissory notes discounted with Talcott.[14] Indeed, the notes of Dreyfuss and Stratford alone well exceeded that percentage. It thus boils down to whether, prior to May 16, BarChris was "required to repurchase" them.

Speaking very strictly, Talcott's letters of April 21 and May 5 did not constitute a demand for immediate repurchase. I feel constrained to find, therefore, that the statement in the prospectus was literally true, even as of May 16, 1961.

But this is by no means the whole story. It is clear beyond question that the prospectus, although literally true, was impliedly false. It gave the unmistakable impression that BarChris's problems with customers' credit and performance were minimal and that Bar-

14. Talcott was the principal "unaffiliated financial institution" and the evidence as to events in the spring of 1961 related almost entirely to BarChris's relations with Talcott. There was, to be sure, some evidence with respect to another factor, Mali. Notes discounted by Mali were also in arrears at that time. There is nothing to show that the experience of any other factor was substantially different.

Chris's experience in this respect had been and continued to be eminently satisfactory. As of the effective date of the prospectus, nothing could have been further from the truth. Indeed, it is fair to say, on all the evidence, that it was only by dint of Russo's skillful negotiations, understandably enhanced by Talcott's awareness of the fact that BarChris stood to receive over $3,000,000 on May 24 from the sale of the debentures, that Talcott was induced to refrain from making formal demand on BarChris to repurchase all Dreyfuss and Stratford notes and, in all likelihood, all notes of Leader and Federal as well. BarChris could not have complied with such a demand before May 24. As of May 16, BarChris's situation vis-a-vis Talcott was highly precarious. There is no suggestion of this in the prospectus. The failure to disclose it was misleading.

### Description of BarChris's Business

█ The prospectus stated on page 5 that BarChris "is engaged in the design, manufacture, construction, installation, modernizing and repair of bowling alleys and the manufacture and sale of related equipment * * *." Plaintiffs claim that this was misleading because it did not reveal that BarChris was also engaged in operating bowling alleys.

As far as appears, the only alley that BarChris actually operated prior to May 16, 1961 was Capitol, which it had operated since December 1960. There is no doubt, however, that by May it intended to operate two others, Bridge and Yonkers. Its subsidiary, Parkway Lanes, Inc., which eventually operated Bridge, was incorporated in April 1961. Its subsidiary, Yonkers Lanes, Inc., which eventually operated Yonkers, was organized on May 4, 1961. There was also Woonsocket, which BarChris was about to begin building, without a contract, in March 1961, and which BarChris eventually did build and operate.

Furthermore, as we have seen, by May 1961 BarChris realized that in all likelihood it would soon be required to repossess alleys of defaulting customers and to operate them as well. Indeed, Russo had informed Talcott, as Talcott's letter of April 21, 1961 shows, that BarChris contemplated forming a subsidiary to operate five such alleys, Dreyfuss (Harlem), Stratford, Leader, Federal and Hart. All in all, BarChris's alley operation, present or prospective, can hardly be said to have been negligible in May 1961.

Operating an alley is obviously quite a different business from constructing one, with different problems and different risks. There is not a word of this in the prospectus. It was something that purchasers of the debentures were entitled to know. I find, therefore, that the omission of any reference to this subject rendered the description of BarChris's business incomplete and therefore misleading.

### Down Payments on Customers' Contracts

█ The prospectus stated on page 5:

"It is the customary practice of the Company to accept approximately 15% to 25% of the total contract price in cash and to permit instalment payments monthly over a three to seven-year period of the balance of the contract price."

Plaintiffs contend that this statement was false in that it was not BarChris's customary practice to require a down payment of 15 per cent to 25 per cent.

The evidence is inconclusive. Plaintiffs rely chiefly on BarChris's accounts receivable ledger which in some instances does not reveal any down payment on a particular contract. But the testimony is that often down payments were not recorded in the accounts receivable ledger because they were not considered to be "receivables." BarChris thought of them as money "received" and hence to be accounted for only as cash.

Although at first blush this method of accounting may strike one as peculiar, plaintiffs have not proved that it was not in accordance with generally accepted

accounting principles. In any event, it was the method that BarChris employed. In view of that fact, and in view of the present incomplete state of BarChris's records, it was impossible to ascertain what down payment BarChris actually did receive on each of its numerous contracts.

The contracts customarily recited the receipt of a down payment, but we have seen that in the case of T-Bowl at least, these recitals were unreliable. The T-Bowl "contracts," however, as I have already found, were not enforceable contracts. Hence, what BarChris did or did not do as to them is of little help in determining what its practice was with respect to firm customer commitments.

Equally irrelevant is the fact that Bar-Chris did not receive any down payment on alleys which it did not sell but operated itself. It is also immaterial that the procedure was different on contracts for interiors which were financed under the alternative method of financing. Fairly construed, the statement in the prospectus did not apply to them.

On the whole, plaintiffs have not proved with sufficiently clear and convincing evidence that BarChris's "customary practice" was different from that described in the prospectus, even though BarChris may have deviated from that practice in particular instances.

*Summary*

For convenience, the various falsities and omissions which I have discussed in the preceding pages are recapitulated here. They were as follows:

1. 1960 Earnings

 (a) Sales

| | |
|---|---|
| As per prospectus | $9,165,320 |
| Correct figure | 8,511,420 |
| Overstatement | $ 653,900 |

 (b) Net Operating Income

| | |
|---|---|
| As per prospectus | $1,742,801 |
| Correct figure | 1,496,196 |
| Overstatement | $ 246,605 |

 (c) Earnings per Share

| | |
|---|---|
| As per prospectus | $ .75 |
| Correct figure | .65 |
| Overstatement | $ .10 |

2. 1960 Balance Sheet

 Current Assets

| | |
|---|---|
| As per prospectus | $4,524,021 |
| Correct figure | 3,914,332 |
| Overstatement | $ 609,689 |

3. Contingent Liabilities as of December 31, 1960 on Alternative Method of Financing

| | |
|---|---|
| As per prospectus | $ 750,000 |
| Correct figure | 1,125,795 |
| Understatement | $ 375,795 |
| Capitol Lanes should have been shown as a direct liability | $ 325,000 |

4. Contingent Liabilities as of April 30, 1961

| | |
|---|---|
| As per prospectus | $ 825,000 |
| Correct figure | 1,443,853 |
| Understatement | $ 618,853 |
| Capitol Lanes should have been shown as a direct liability | $ 314,166 |

5. Earnings Figures for Quarter ending March 31, 1961

 (a) Sales

| | |
|---|---|
| As per prospectus | $2,138,455 |
| Correct figure | 1,618,645 |
| Overstatement | $ 519,810 |

 (b) Gross Profit

| | |
|---|---|
| As per prospectus | $ 483,121 |
| Correct figure | 252,366 |
| Overstatement | $ 230,755 |

6. Backlog as of March 31, 1961

| | |
|---|---|
| As per prospectus | $6,905,000 |
| Correct figure | 2,415,000 |
| Overstatement | $4,490,000 |

7. Failure to Disclose Officers' Loans Outstanding and Unpaid on May 16, 1961 $ 386,615

8. Failure to Disclose Use of Proceeds in Manner not Revealed in Prospectus

 Approximately $1,160,000

9. Failure to Disclose Customers' Delinquencies in May 1961 and Bar-Chris's Potential Liability with Respect Thereto

 Over $1,350,000

10. Failure to Disclose the Fact that BarChris was Already Engaged, and was about to be More Heavily Engaged, in the Operation of Bowling Alleys

---

### Materiality

It is a prerequisite to liability under Section 11 of the Act that the fact which is falsely stated in a registration statement, or the fact that is omitted when it should have been stated to avoid misleading, be "material." The regulations of the Securities and

Exchange Commission pertaining to the registration of securities define the word as follows (17 C.F.R. § 230.405(*l*)):

> "The term 'material', when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered."

What are "matters as to which an average prudent investor ought reasonably to be informed"? It seems obvious that they are matters which such an investor needs to know before he can make an intelligent, informed decision whether or not to buy the security.

■ Early in the history of the Act, a definition of materiality was given in Matter of Charles A. Howard, 1 S.E.C. 6, 8 (1934), which is still valid today. A material fact was there defined as:

> " * * * a fact which if it had been correctly stated or disclosed would have deterred or tended to deter the average prudent investor from purchasing the securities in question."

Cf. List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965) (Securities Exchange Act of 1934 § 10(b)); Restatement of Torts § 538 (2) (a) (1938); Restatement (Second) of Torts § 402B comment g (1965)

■ The average prudent investor is not concerned with minor inaccuracies or with errors as to matters which are of no interest to him. The facts which tend to deter him from purchasing a security are facts which have an important bearing upon the nature or condition of the issuing corporation or its business.

Judged by this test, there is no doubt that many of the misstatements and omissions in this prospectus were material. This is true of all of them which relate to the state of affairs in 1961, i. e., the overstatement of sales and gross profit for the first quarter, the understatement of contingent liabilities as of April 30, the overstatement of orders on hand and the failure to disclose the true facts with respect to officers' loans, customers' delinquencies, application of proceeds and the prospective operation of several alleys.

The misstatements and omissions pertaining to BarChris's status as of December 31, 1960, however, present a much closer question. The 1960 earnings figures, the 1960 balance sheet and the contingent liabilities as of December 31, 1960 were not nearly as erroneous as plaintiffs have claimed. But they were wrong to some extent, as we have seen. Would it have deterred the average prudent investor from purchasing these debentures if he had been informed that the 1960 sales were $8,511,420 rather than $9,165,320, that the net operating income was $1,496,196 rather than $1,742,801 and that the earnings per share in 1960 were approximately 65¢ rather than 75¢? According to the unchallenged figures, sales in 1959 were $3,320,121, net operating income was $441,103, and earnings per share were 33¢. Would it have made a difference to an average prudent investor if he had known that in 1960 sales were only 256 per cent of 1959 sales, not 276 per cent; that net operating income was up by only $1,055,093, not by $1,301,698, and that earnings per share, while still approximately twice those of 1959, were not something more than twice?

These debentures were rated "B" by the investment rating services. They were thus characterized as speculative, as any prudent investor must have realized. It would seem that anyone interested in buying these convertible debentures would have been attracted primarily by the conversion feature, by the growth potential of the stock. The growth which the company enjoyed in 1960 over prior years was striking, even on the correct figures. It is hard to see how a prospective purchaser of this type of investment would have been deterred from buying if he had been advised of

these comparatively minor errors in reporting 1960 sales and earnings.

■ Since no one knows what moves or does not move the mythical "average prudent investor," it comes down to a question of judgment, to be exercised by the trier of the fact as best he can in the light of all the circumstances. It is my best judgment that the average prudent investor would not have cared about these errors in the 1960 sales and earnings figures, regrettable though they may be. I therefore find that they were not material within the meaning of Section 11.

The same is true of the understatement of contingent liabilities in footnote 9 by approximately $375,000. As disclosed in that footnote, BarChris's contingent liability as of December 31, 1960 on notes discounted was $3,969,835 and, according to the footnote, on the alternative method of financing was $750,000, a total of $4,719,835. This was a huge amount for a company with total assets, as per balance sheet, of $6,101,085. Purchasers were necessarily made aware of this by the figures actually disclosed. If they were willing to buy the debentures in the face of this information, as they obviously were, I doubt that they would have been deterred if they had been told that the contingent liabilities were actually $375,000 higher.

This leaves for consideration the errors in the 1960 balance sheet figures which have previously been discussed in detail. Current assets were overstated by approximately $600,000.[15] Liabilities were understated by approximately $325,000 by the failure to treat the liability on Capitol Lanes as a direct liability of BarChris on a consolidated basis. Of this $325,000 approximately $65,000, the amount payable on Capitol within one year, should have been treated as a current liability.

As per balance sheet, cash was $285,482. In fact, $145,000 of this had been borrowed temporarily from Talcott and was to be returned by January 16, 1961 so that realistically, cash was only $140,482. Trade accounts receivable were overstated by $150,000 by including Howard Lanes Annex, an alley which was not sold to an outside buyer.

As per balance sheet, total current assets were $4,524,021, and total current liabilities were $2,413,867, a ratio of approximately 1.9 to 1. This was bad enough, but on the true facts, the ratio was worse. As corrected, current assets, as near as one can tell, were approximately $3,924,000, and current liabilities approximately $2,478,000, a ratio of approximately 1.6 to 1.

Would it have made any difference if a prospective purchaser of these debentures had been advised of these facts? There must be some point at which errors in disclosing a company's balance sheet position become material, even to a growth-oriented investor. On all the evidence I find that these balance sheet errors were material within the meaning of Section 11.

Since there was an abundance of material misstatements pertaining to 1961 affairs, whether or not the errors in the 1960 figures were material does not affect the outcome of this case except to the extent that it bears upon the liability of Peat, Marwick. That subject will be discussed hereinafter.

*The "Due Diligence" Defenses*

Section 11(b) of the Act provides that:

" * * * no person, other than the issuer, shall be liable * * * who shall sustain the burden of proof—

* * *

(3) that (A) as regards any part of the registration statement not purporting to be made on the authority of an expert * * * he had, after reasonable investigation, reasonable

---

15. This figure assumes that the entire $264,689 of factors' reserves was non-current. Some part of it probably was current on the theory that part would be released by the factors within one year, but this amount cannot be determined on the evidence and, in any case, it would seem to have been small.

ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; * * * and (C) as regards any part of the registration statement purporting to be made on the authority of an expert (other than himself) * * * he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading * * *."

Section 11(c) defines "reasonable investigation" as follows:

"In determining, for the purpose of paragraph (3) of subsection (b) of this section, what constitutes reasonable investigation and reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property."

■ Every defendant, except BarChris itself, to whom, as the issuer, these defenses are not available, and except Peat, Marwick, whose position rests on a different statutory provision,[16] has pleaded these affirmative defenses. Each claims that (1) as to the part of the registration statement purporting to be made on the authority of an expert (which, for convenience, I shall refer to as the "expertised portion"), he had no reasonable ground to believe and did not believe that there were any untrue statements or material omissions, and (2) as to the other parts of the registration statement, he made a reasonable investigation, as a result of which he had reasonable ground to believe and did believe that the registration statement was true and that no material fact was omitted.

As to each defendant, the question is whether he has sustained the burden of proving these defenses. Surprising enough, there is little or no judicial authority on this question. No decisions directly in point under Section 11 have been found.

■ Before considering the evidence, a preliminary matter should be disposed of. The defendants do not agree among themselves as to who the "experts" were or as to the parts of the registration statement which were expertised. Some defendants say that Peat, Marwick was the expert, others say that BarChris's attorneys, Perkins, Daniels, McCormack & Collins, and the underwriters' attorneys, Drinker, Biddle & Reath, were also the experts. On the first view, only those portions of the registration statement purporting to be made on Peat, Marwick's authority were expertised portions. On the other view, everything in the registration statement was within this category, because the two law firms were responsible for the entire document.

The first view is the correct one. To say that the entire registration statement is expertised because some lawyer prepared it would be an unreasonable construction of the statute. Neither the lawyer for the company nor the lawyer for the underwriters is an expert within the meaning of Section 11. The only expert, in the statutory sense, was Peat, Marwick, and the only parts of the registration statement which purported to be made upon the authority of an expert were the portions which purported to be made on Peat, Marwick's authority.

■ The parties also disagree as to what those portions were. Some defendants say that it was only the 1960 figures (and the figures for prior years, which are not in controversy here). Others say in substance that it was every figure in the prospectus. The plaintiffs take a somewhat intermediate view. They do not claim that Peat, Marwick expertised every figure, but they do maintain that Peat, Marwick is responsible for a por-

16. This statutory provision will be quoted in discussing Peat, Marwick's liability *infra*.

tion of the text of the prospectus, i. e., that pertaining to "Methods of Operation," because a reference to it was made in footnote 9 to the balance sheet.

Here again, the more narrow view is the correct one. The registration statement contains a report of Peat, Marwick as independent public accountants dated February 23, 1961. This relates only to the consolidated balance sheet of Bar-Chris and consolidated subsidiaries as of December 31, 1960, and the related statement of earnings and retained earnings for the five years then ended. This is all that Peat, Marwick purported to certify. It is perfectly clear that it did not purport to certify the 1961 figures, some of which are expressly stated in the prospectus to have been unaudited.

Moreover, plaintiffs' intermediate view is also incorrect. The cross reference in footnote 9 to the "Methods of Operation" passage in the prospectus was inserted merely for the convenience of the reader. It is not a fair construction to say that it thereby imported into the balance sheet everything in that portion of the text, much of which had nothing to do with the figures in the balance sheet.

I turn now to the question of whether defendants have proved their due diligence defenses. The position of each defendant will be separately considered.

### Russo

Russo was, to all intents and purposes, the chief executive officer of BarChris. He was a member of the executive committee. He was familiar with all aspects of the business. He was personally in charge of dealings with the factors. He acted on BarChris's behalf in making the financing agreements with Talcott and he handled the negotiations with Talcott in the spring of 1961. He talked with customers about their delinquencies.

Russo prepared the list of jobs which went into the backlog figure. He knew the status of those jobs. In addition to being chief executive officer of BarChris, he was a director of T-Bowl Interna-

tional, Inc., and the principals in St. Ann's were his friends.

It was Russo who arranged for the temporary increase in BarChris's cash in banks on December 31, 1960, a transaction which borders on the fraudulent. He was thoroughly aware of BarChris's stringent financial condition in May 1961. He had personally advanced large sums to BarChris of which $175,000 remained unpaid as of May 16.

In short, Russo knew all the relevant facts. He could not have believed that there were no untrue statements or material omissions in the prospectus. Russo has no due diligence defenses.

### Vitolo and Pugliese

They were the founders of the business who stuck with it to the end. Vitolo was president and Pugliese was vice president. Despite their titles, their field of responsibility in the administration of BarChris's affairs during the period in question seems to have been less all-embracing than Russo's. Pugliese in particular appears to have limited his activities to supervising the actual construction work.

Vitolo and Pugliese are each men of limited education. It is not hard to believe that for them the prospectus was difficult reading, if indeed they read it at all.

But whether it was or not is irrelevant. The liability of a director who signs a registration statement does not depend upon whether or not he read it or, if he did, whether or not he understood what he was reading.

And in any case, Vitolo and Pugliese were not as naive as they claim to be. They were members of BarChris's executive committee. At meetings of that committee BarChris's affairs were discussed at length. They must have known what was going on. Certainly they knew of the inadequacy of cash in 1961. They knew of their own large advances to the company which remained unpaid. They knew that they had agreed not to deposit their checks until the fi-

nancing proceeds were received. They knew and intended that part of the proceeds were to be used to pay their own loans.

All in all, the position of Vitolo and Pugliese is not significantly different, for present purposes, from Russo's. They could not have believed that the registration statement was wholly true and that no material facts had been omitted. And in any case, there is nothing to show that they made any investi-' gation of anything which they may not have known about or understood. They have not proved their due diligence defenses.

### Kircher

■ Kircher was treasurer of Bar-Chris and its chief financial officer. He is a certified public accountant and an intelligent man. He was thoroughly familiar with BarChris's financial affairs. He knew the terms of BarChris's agreements with Talcott. He knew of the customers' delinquency problem. He participated actively with Russo in May 1961 in the successful effort to hold Talcott off until the financing proceeds came in. He knew how the financing proceeds were to be applied and he saw to it that they were so applied. He arranged the officers' loans and he knew all the facts concerning them.

Moreover, as a member of the executive committee, Kircher was kept informed as to those branches of the business of which he did not have direct charge. He knew about the operation of alleys, present and prospective. He knew that Capitol was included in 1960 sales and that Bridge and Yonkers were included in first quarter 1961 sales despite the fact that they were not sold. Kircher knew of the infirmities in customers' contracts included in the backlog figure. Indeed, at a later date, he specifically criticized Russo's handling of the T-Bowl situation. In brief, Kircher knew all the relevant facts.

Kircher worked on the preparation of the registration statement. He conferred with Grant and on occasion with Ballard. He supplied information to them about the company's business. He read the prospectus and understood it. He knew what it said and what it did not say.

Kircher's contention is that he had never before dealt with a registration statement, that he did not know what it should contain, and that he relied wholly on Grant, Ballard and Peat, Marwick to guide him. He claims that it was their fault, not his, if there was anything wrong with it. He says that all the facts were recorded in BarChris's books where these "experts" could have seen them if they had looked. He says that he truthfully answered all their questions. In effect, he says that if they did not know enough to ask the right questions and to give him the proper instructions, that is not his responsibility.

There is an issue of credibility here. In fact, Kircher was not frank in dealing with Grant and Ballard. He withheld information from them. But even if he had told them all the facts, this would not have constituted the due diligence contemplated by the statute. Knowing the facts, Kircher had reason to believe that the expertised portion of the prospectus, i. e., the 1960 figures, was in part incorrect. He could not shut his eyes to the facts and rely on Peat, Marwick for that portion.

As to the rest of the prospectus, knowing the facts, he did not have a reasonable ground to believe it to be true. On the contrary, he must have known that in part it was untrue. Under these circumstances, he was not entitled to sit back and place the blame on the lawyers for not advising him about it.

Kircher has not proved his due diligence defenses.

### Trilling

■ Trilling's position is somewhat different from Kircher's. He was Bar-Chris's controller. He signed the registration statement in that capacity, although he was not a director.

Trilling entered BarChris's employ in October 1960. He was Kircher's subordi-

nate. When Kircher asked him for information, he furnished it. On at least one occasion he got it wrong.[17]

Trilling was not a member of the executive committee. He was a comparatively minor figure in BarChris. The description of BarChris's "management" on page 9 of the prospectus does not mention him. He was not considered to be an executive officer.

Trilling may well have been unaware of several of the inaccuracies in the prospectus. But he must have known of some of them. As a financial officer, he was familiar with BarChris's finances and with its books of account. He knew that part of the cash on deposit on December 31, 1960 had been procured temporarily by Russo for window dressing purposes. He knew that BarChris was operating Capitol Lanes in 1960. He should have known, although perhaps through carelessness he did not know at the time, that BarChris's contingent liability on Type B lease transactions was greater than the prospectus stated. In the light of these facts, I cannot find that Trilling believed the entire prospectus to be true.

But even if he did, he still did not establish his due diligence defenses. He did not prove that as to the parts of the prospectus expertised by Peat, Marwick he had no reasonable ground to believe that it was untrue. He also failed to prove, as to the parts of the prospectus not expertised by Peat, Marwick, that he made a reasonable investigation which afforded him a reasonable ground to believe that it was true. As far as appears, he made no investigation. He did what was asked of him and assumed that others would properly take care of supplying accurate data as to the other aspects of the company's business. This would have been well enough but for the fact that he signed the registration statement. As a signer, he could not avoid responsibility by leaving it up to others to make it accurate. Trilling did not sustain the burden of proving his due diligence defenses.

### Birnbaum

 Birnbaum was a young lawyer, admitted to the bar in 1957, who, after brief periods of employment by two different law firms and an equally brief period of practicing in his own firm, was employed by BarChris as house counsel and assistant secretary in October 1960. Unfortunately for him, he became secretary and a director of BarChris on April 17, 1961, after the first version of the registration statement had been filed with the Securities and Exchange Commission. He signed the later amendments, thereby becoming responsible for the accuracy of the prospectus in its final form.

Although the prospectus, in its description of "management," lists Birnbaum among the "executive officers" and devotes several sentences to a recital of his career, the fact seems to be that he was not an executive officer in any real sense. He did not participate in the management of the company. As house counsel, he attended to legal matters of a routine nature. Among other things, he incorporated subsidiaries, with which BarChris was plentifully supplied. Among the subsidiaries which he incorporated were Capitol Lanes, Inc. which operated Capitol, Yonkers Lanes, Inc. which eventually operated Yonkers, and Parkway Lanes, Inc. which eventually operated Bridge. He was thus aware of that aspect of the business.

Birnbaum examined contracts. In that connection he advised BarChris that the T-Bowl contracts were not legally enforceable. He was thus aware of that fact.

One of Birnbaum's more important duties, first as assistant secretary and later

---

**17.** Trilling computed contingent liabilities on the Type B lease financing as of April 30, 1961 at 25 per cent although at least by the time of the trial he knew that it was 100 per cent. He seems to have merely brought down to date, without checking, the December 30, 1960 statement of contingent liabilities prepared by Peat, Marwick which was similarly inaccurate, as has been pointed out.

as full-fledged secretary, was to keep the corporate minutes of BarChris and its subsidiaries. This necessarily informed him to a considerable extent about the company's affairs. Birnbaum was not initially a member of the executive committee, however, and did not keep its minutes at the outset. According to the minutes, the first meeting which he attended, "upon invitation of the Committee," was on March 22, 1961. He became a member shortly thereafter and kept the minutes beginning with the meeting of April 24, 1961.

It seems probable that Birnbaum did not know of many of the inaccuracies in the prospectus. He must, however, have appreciated some of them. In any case, he made no investigation and relied on the others to get it right. Unlike Trilling, he was entitled to rely upon Peat, Marwick for the 1960 figures, for as far as appears, he had no personal knowledge of the company's books of account or financial transactions. But he was not entitled to rely upon Kircher, Grant and Ballard for the other portions of the prospectus. As a lawyer, he should have known his obligations under the statute. He should have known that he was required to make a reasonable investigation of the truth of all the statements in the unexpertised portion of the document which he signed. Having failed to make such an investigation, he did not have reasonable ground to believe that all these statements were true. Birnbaum has not established his due diligence defenses except as to the audited 1960 figures.

*Auslander*

Auslander was an "outside" director, i. e., one who was not an officer of BarChris. He was chairman of the board of Valley Stream National Bank in Valley Stream, Long Island. In February 1961 Vitolo asked him to become a director of BarChris. Vitolo gave him an enthusias-

tic account of BarChris's progress and prospects. As an inducement, Vitolo said that when BarChris received the proceeds of a forthcoming issue of securities, it would deposit $1,000,000 in Auslander's bank.[18]

In February and early March 1961, before accepting Vitolo's invitation, Auslander made some investigation of BarChris. He obtained Dun & Bradstreet reports which contained sales and earnings figures for periods earlier than December 31, 1960. He caused inquiry to be made of certain of BarChris's banks and was advised that they regarded BarChris favorably. He was informed that inquiry of Talcott had also produced a favorable response.

On March 3, 1961, Auslander indicated his willingness to accept a place on the board. Shortly thereafter, on March 14, Kircher sent him a copy of BarChris's annual report for 1960. Auslander observed that BarChris's auditors were Peat, Marwick. They were also the auditors for the Valley Stream National Bank. He thought well of them.

Auslander was elected a director on April 17, 1961. The registration statement in its original form had already been filed, of course without his signature. On May 10, 1961, he signed a signature page for the first amendment to the registration statement which was filed on May 11, 1961. This was a separate sheet without any document attached. Auslander did not know that it was a signature page for a registration statement. He vaguely understood that it was something "for the SEC."

Auslander attended a meeting of BarChris's directors on May 15, 1961. At that meeting he, along with the other directors, signed the signature sheet for the second amendment which constituted the registration statement in its final form. Again, this was only a separate sheet without any document attached.

18. After BarChris received the financing proceeds, it deposited in the Valley Stream National Bank not $1,000,000, but $150,000 in a checking account and $150,000 in a six-months' time deposit. The checking account was reduced to approximately $12,000 within a few weeks.

Auslander never saw a copy of the registration statement in its final form.

At the May 15 directors' meeting, however, Auslander did realize that what he was signing was a signature sheet to a registration statement. This was the first time that he had appreciated that fact. A copy of the registration statement in its earlier form as amended on May 11, 1961 was passed around at the meeting. Auslander glanced at it briefly. He did not read it thoroughly.

At the May 15 meeting, Russo and Vitolo stated that everything was in order and that the prospectus was correct. Auslander believed this statement.

In considering Auslander's due diligence defenses, a distinction is to be drawn between the expertised and non-expertised portions of the prospectus. As to the former, Auslander knew that Peat, Marwick had audited the 1960 figures. He believed them to be correct because he had confidence in Peat, Marwick. He had no reasonable ground to believe otherwise.

As to the non-expertised portions, however, Auslander is in a different position. He seems to have been under the impression that Peat, Marwick was responsible for all the figures. This impression was not correct, as he would have realized if he had read the prospectus carefully. Auslander made no investigation of the accuracy of the prospectus. He relied on the assurance of Vitolo and Russo, and upon the information he had received in answer to his inquiries back in February and early March. These inquiries were general ones, in the nature of a credit check. The information which he received in answer to them was also general, without specific reference to the statements in the prospectus, which was not prepared until some time thereafter.

It is true that Auslander became a director on the eve of the financing. He had little opportunity to familiarize himself with the company's affairs.[19] The

question is whether, under such circumstances, Auslander did enough to establish his due diligence defense with respect to the non-expertised portions of the prospectus.

Although there is a dearth of authority under Section 11 on this point, an English case under the analogous Companies Act is of some value. In Adams v. Thrift, [1915] 1 Ch. 557, aff'd, [1915] 2 Ch. 21, it was held that a director who knew nothing about the prospectus and did not even read it, but who relied on the statement of the company's managing director that it was "all right," was liable for its untrue statements. See also In the Matter of Interstate Hosiery Mills, Inc., 4 S.E.C. 706 (1939).

■ Section 11 imposes liability in the first instance upon a director, no matter how new he is. He is presumed to know his responsibility when he becomes a director. He can escape liability only by using that reasonable care to investigate the facts which a prudent man would employ in the management of his own property. In my opinion, a prudent man would not act in an important matter without any knowledge of the relevant facts, in sole reliance upon representations of persons who are comparative strangers and upon general information which does not purport to cover the particular case. To say that such minimal conduct measures up to the statutory standard would, to all intents and purposes, absolve new directors from responsibility merely because they are new. This is not a sensible construction of Section 11, when one bears in mind its fundamental purpose of requiring full and truthful disclosure for the protection of investors.

■ I find and conclude that Auslander has not established his due diligence defense with respect to the misstatements and omissions in those por-

19. This fact was not mentioned in the prospectus, which set forth length of service only with respect to the officer directors.

tions of the prospectus other than the audited 1960 figures.

### Rose

██ Rose, another "outside" director, is in a position comparable to Auslander's. He is a civil engineer. Peat, Marwick were the auditors for his firm and Kircher, when he was employed by Peat, Marwick, had worked on his firm's books in 1957 and 1958. Rose was favorably impressed by Kircher at that time.

Rose had not seen Kircher after the spring of 1959 until March 1961 when Kircher met with him, at Kircher's request, and invited him to become a director of BarChris. Kircher explained that BarChris did a good deal of construction work. He hinted that there might be a need for Rose's services as an engineer.[20]

Shortly after this meeting, Kircher sent Rose a copy of BarChris's annual report for 1960. Rose observed that Peat, Marwick were BarChris's auditors. Subsequently, in March, he inquired about BarChris of three different brokers. They informed him that BarChris was apparently well managed, that it had enjoyed a steady growth, and that its stock had gone up considerably, although it paid no dividends.

Rose visited BarChris's office in mid-March and was interested in the bowling exhibit on display there. He had dinner with Vitolo who explained BarChris's plans for expansion. The other officers talked to him in a similar vein.

Rose agreed to become a director and was elected on April 17, 1961, along with Auslander and the others. Rose was present at that meeting and there learned of the proposed financing for the first time. He read the first (March 30) version of the registration statement for "about ten minutes."

On May 10, Rose signed a separate signature sheet for the first amendment.

Unlike Auslander, Rose did know that the signature sheet pertained to a registration statement.

Rose attended the directors' meeting on May 15. He signed the signature sheet for the registration statement in its final form. The entire document was not submitted to the meeting.

Immediately prior to the May 15 meeting, Kircher told Rose that the progress of the company for the first quarter "was very much in line with the preceding year," but that BarChris expected to have a better year in 1961 than in 1960. At the meeting Rose inquired if the information in the registration statement was correct. Vitolo and Russo said that it was.

Up to May 16, Rose had not participated in BarChris's affairs. He made no investigation. He believed that the registration statement was true. The only basis for his belief was his reliance upon Peat, Marwick and upon the BarChris officers.

What has been said with respect to Auslander applies equally to Rose. He has not sustained the burden of proving his due diligence defense as to the portions of the registration statement other than the audited 1960 figures.

### Grant

██ Grant became a director of BarChris in October 1960. His law firm was counsel to BarChris in matters pertaining to the registration of securities. Grant drafted the registration statement for the stock issue in 1959 and for the warrants in January 1961. He also drafted the registration statement for the debentures. In the preliminary division of work between him and Ballard, the underwriters' counsel, Grant took initial responsibility for preparing the registration statement, while Ballard devoted his efforts in the first instance to preparing the indenture.

---

20. It does not appear that Rose was ever so employed by BarChris.

Grant is sued as a director and as a signer of the registration statement. This is not an action against him for malpractice in his capacity as a lawyer. Nevertheless, in considering Grant's due diligence defenses, the unique position which he occupied cannot be disregarded. As the director most directly concerned with writing the registration statement and assuring its accuracy, more was required of him in the way of reasonable investigation than could fairly be expected of a director who had no connection with this work.

There is no valid basis for plaintiffs' accusation that Grant knew that the prospectus was false in some respects and incomplete and misleading in others. Having seen him testify at length, I am satisfied as to his integrity. I find that Grant honestly believed that the registration statement was true and that no material facts had been omitted from it.

In this belief he was mistaken, and the fact is that for all his work, he never discovered any of the errors or omissions which have been recounted at length in this opinion, with the single exception of Capitol Lanes. He knew that BarChris had not sold this alley and intended to operate it, but he appears to have been under the erroneous impression that Peat, Marwick had knowingly sanctioned its inclusion in sales because of the allegedly temporary nature of the operation.

Grant contends that a finding that he did not make a reasonable investigation would be equivalent to a holding that a lawyer for an issuing company, in order to show due diligence, must make an independent audit of the figures supplied to him by his client. I do not consider this to be a realistic statement of the issue. There were errors and omissions here which could have been detected without an audit. The question is whether, despite his failure to detect them, Grant made a reasonable effort to that end.

Much of this registration statement is a scissors and paste-pot job. Grant lifted large portions from the earlier prospectuses, modifying them in some instances to the extent that he considered necessary. But BarChris's affairs had changed for the worse by May 1961. Statements that were accurate in January were no longer accurate in May. Grant never discovered this. He accepted the assurances of Kircher and Russo that any change which might have occurred had been for the better, rather than the contrary.

It is claimed that a lawyer is entitled to rely on the statements of his client and that to require him to verify their accuracy would set an unreasonably high standard. This is too broad a generalization. It is all a matter of degree. To require an audit would obviously be unreasonable. On the other hand, to require a check of matters easily verifiable is not unreasonable. Even honest clients can make mistakes. The statute imposes liability for untrue statements regardless of whether they are intentionally untrue. The way to prevent mistakes is to test oral information by examining the original written record.

There were things which Grant could readily have checked which he did not check. For example, he was unaware of the provisions of the agreements between BarChris and Talcott. He never read them. Thus, he did not know, although he readily could have ascertained, that BarChris's contingent liability on Type B leaseback arrangements was 100 per cent, not 25 per cent. He did not appreciate that if BarChris defaulted in repurchasing delinquent customers' notes upon Talcott's demand, Talcott could accelerate all the customer paper in its hands, which amounted to over $3,000,000.

As to the backlog figure, Grant appreciated that scheduled unfilled orders on the company's books meant firm commitments, but he never asked to see the contracts which, according to the prospectus, added up to $6,905,000. Thus, he did not know that this figure was overstated by some $4,490,000.

Grant was unaware of the fact that BarChris was about to operate Bridge and Yonkers. He did not read the minutes of those subsidiaries which would have revealed that fact to him. On the subject of minutes, Grant knew that minutes of certain meetings of the BarChris executive committee held in 1961 had not been written up. Kircher, who had acted as secretary at those meetings, had complete notes of them. Kircher told Grant that there was no point in writing up the minutes because the matters discussed at those meetings were purely routine. Grant did not insist that the minutes be written up, nor did he look at Kircher's notes. If he had, he would have learned that on February 27, 1961 there was an extended discussion in the executive committee meeting about customers' delinquencies, that on March 8, 1961 the committee had discussed the pros and cons of alley operation by Bar-Chris, that on March 18, 1961 the committee was informed that BarChris was constructing or about to begin constructing twelve alleys for which it had no contracts, and that on May 13, 1961 Dreyfuss, one of the worst delinquents, had filed a petition in Chapter X.

Grant knew that there had been loans from officers to BarChris in the past because that subject had been mentioned in the 1959 and January 1961 prospectuses. In March Grant prepared a questionnaire to be answered by officers and directors for the purpose of obtaining information to be used in the prospectus. The questionnaire did not inquire expressly about the existence of officers' loans.[21] At approximately the same time, Grant prepared another questionnaire in order to obtain information on proxy statements for the annual stockholders' meeting. This questionnaire asked each officer to state whether he was indebted

to BarChris, but it did not ask whether BarChris was indebted to him.

Despite the inadequacy of these written questionnaires, Grant did, on March 16, 1961, orally inquire as to whether any officers' loans were outstanding. He was assured by Russo, Vitolo and Pugliese that all such loans had been repaid. Grant did not ask again. He was unaware of the new loans in April. He did know, however, that, at Kircher's request, a provision was inserted in the indenture which gave loans from individuals priority over the debentures. Kircher's insistence on this clause did not arouse his suspicions.

It is only fair to say that Grant was given to understand by Kircher that there were no new officers' loans and that there would not be any before May 16. It is still a close question, however, whether, under all the circumstances, Grant should have investigated further, perhaps by asking Peat, Marwick, in the course of its S–1 review, to look at the books on this particular point. I believe that a careful man would have checked.

There is more to the subject of due diligence than this, particularly with respect to the application of proceeds and customers' delinquencies.

The application of proceeds language in the prospectus was drafted by Kircher back in January. It may well have expressed his intent at that time, but his intent, and that of the other principal officers of BarChris, was very different in May. Grant did not appreciate that the earlier language was no longer appropriate. He never learned of the situation which the company faced in May. He knew that BarChris was short of cash, but he had no idea how short. He did not know that BarChris was withholding delivery of checks already drawn and signed because there was not enough

---

21. Question 3 of this questionnaire read: "Describe briefly and state the approximate amount of any material interest, direct or indirect, of you, or any associate of you, in any material transactions during the last three years, or in any material proposed transac-

tions, to which the Company or its subsidiaries were or are to be a party." This involved query could hardly have been understood by men like Vitolo and Pugliese to call for information as to loans.

money in the bank to pay them. He did not know that the officers of the company intended to use immediately approximately one-third of the financing proceeds in a manner not disclosed in the prospectus, including approximately $1,000,000 in paying old debts.

In this connection, mention should be made of a fact which has previously been referred to only in passing. The "negative cash balance" in BarChris's Lafayette National Bank account in May 1961 included a check dated April 10, 1961 to the order of Grant's firm, Perkins, Daniels, McCormack & Collins, in the amount of $8,711. This check was not deposited by Perkins, Daniels until June 1, after the financing proceeds had been received by BarChris. Of course, if Grant had knowingly withheld deposit of this check until that time, he would be in a position similar to Russo, Vitolo and Pugliese. I do not believe, however, that that was the case. I find that the check was not delivered by BarChris to Perkins, Daniels until shortly before June 1.

This incident is worthy of mention, however, for another reason. The prospectus stated on page 10 that Perkins, Daniels had "received fees aggregating $13,000" from BarChris. This check for $8,711 was one of those fees. It had not been received by Perkins, Daniels prior to May 16. Grant was unaware of this. In approving this erroneous statement in the prospectus, he did not consult his own bookkeeper to ascertain whether it was correct. Kircher told him that the bill had been paid and Grant took his word for it. If he had inquired and had found that this representation was untrue, this discovery might well have led him to a realization of the true state of BarChris's finances in May 1961.

As far as customers' delinquencies is concerned, although Grant discussed this with Kircher, he again accepted the assurances of Kircher and Russo that no serious problem existed. He did not examine the records as to delinquencies, although BarChris maintained such a record. Any inquiry on his part of Talcott or an examination of BarChris's correspondence with Talcott in April and May 1961 would have apprised him of the true facts. It would have led him to appreciate that the statement in this prospectus, carried over from earlier prospectuses, to the effect that since 1955 BarChris had been required to repurchase less than one-half of one per cent of discounted customers' notes could no longer properly be made without further explanation.

Grant was entitled to rely on Peat, Marwick for the 1960 figures. He had no reasonable ground to believe them to be inaccurate. But the matters which I have mentioned were not within the expertised portion of the prospectus. As to this, Grant, was obliged to make a reasonable investigation. I am forced to find that he did not make one. After making all due allowances for the fact that Bar Chris's officers misled him, there are too many instances in which Grant failed to make an inquiry which he could easily have made which, if pursued, would have put him on his guard. In my opinion, this finding on the evidence in this case does not establish an unreasonably high standard in other cases for company counsel who are also directors. Each case must rest on its own facts. I conclude that Grant has not established his due diligence defenses except as to the audited 1960 figures.

### The Underwriters and Coleman

The underwriters other than Drexel made no investigation of the accuracy of the prospectus. One of them, Peter Morgan, had underwritten the 1959 stock issue and had been a director of BarChris. He thus had some general familiarity with its affairs, but he knew no more than the other underwriters about the debenture prospectus. They all relied upon Drexel as the "lead" underwriter.

Drexel did make an investigation. The work was in charge of Coleman, a partner of the firm, assisted by Casperson, an associate. Drexel's attorneys acted as attorneys for the entire group of underwriters. Ballard did the work, assisted by Stanton.

On April 17, 1961 Coleman became a director of BarChris. He signed the first amendment to the registration statement filed on May 11 and the second amendment, constituting the registration statement in its final form, filed on May 16. He thereby assumed a responsibility as a director and signer in addition to his responsibility as an underwriter.

The facts as to the extent of the investigation that Coleman made may be briefly summarized. He was first introduced to BarChris on September 15, 1960. Thereafter he familiarized himself with general conditions in the industry, primarily by reading reports and prospectuses of the two leading bowling alley builders, American Machine & Foundry Company and Brunswick. These indicated that the industry was still growing. He also acquired general information on BarChris by reading the 1959 stock prospectus, annual reports for prior years, and an unaudited statement for the first half of 1960. He inquired about BarChris of certain of its banks and of Talcott and received favorable replies.

The purpose of this preliminary investigation was to enable Coleman to decide whether Drexel would undertake the financing. It did not have direct reference to any specific registration statement for at that time, of course, none had been prepared. Coleman was sufficiently optimistic about BarChris's prospects to buy 1,000 shares of its stock, which he did in December 1960.

On January 24, 1961, Coleman held a meeting with Ballard, Grant and Kircher, among others. By that time Coleman had about decided to go ahead with the financing, although Drexel's formal letter of intent was not delivered until February 9, 1961 (subsequently revised on March 7, 1961). At this meeting Coleman asked Kircher how BarChris intended to use the proceeds of the financing. In reply to this inquiry, Kircher wrote a letter to Coleman dated January 30, 1961 outlining BarChris's plans. This eventually formed the basis of the application of proceeds section in the prospectus.

Coleman continued his general investigation. He obtained a Dun & Bradstreet report on BarChris on March 16, 1961. He read BarChris's annual report for 1960 which was available in March.

By mid-March, Coleman was in a position to make more specific inquiries. By that time Grant had prepared a first draft of the prospectus, consisting of a marked-up copy of the January 1961 warrant prospectus. Coleman attended three meetings to discuss the prospectus with BarChris's representatives. The meetings were held at Perkins, Daniels' office on March 20, March 23 and March 24, 1961. Those present included Grant or his partner McCormack and Kircher for the company,[22] and Coleman, Casperson and Ballard for the underwriters. Logan, Peat, Marwick's manager of the 1960 audit, was present at one of the meetings.

At these discussions, which were extensive, successive proofs of the prospectus were considered and revised. At this point the 1961 figures were not available. They were put in the prospectus in May.

Coleman and Ballard asked pertinent questions and received answers which satisfied them. Among other things, the following transpired.

Logan explained some of the 1960 figures, including the reserve for bad debts, which he considered adequate.

There was a discussion of the application of proceeds section. It was not changed in any respect material here.

As to the backlog of orders on hand, Ballard said that the figure, not then available, must be "hard and fast," not "puffy." Grant and Kircher "concurred."

There was talk about the 15 to 25 per cent down payment figure. Kircher said that this was accurate.

---

22. Grant was in charge of this work for his firm, but he was out of town on March 20 and March 23, and McCormack substituted for him on those days.

More important for our purposes, there was a discussion of the one-half of one per cent figure with respect to Bar-Chris's past experience in repurchasing discounted customers' notes. Kircher said that this figure was "conservative." Ballard inquired whether, regardless of what past experience had been, there was "any real chance that you see of being forced to take any [alleys] back in the future?" Kircher's answer was "negative."

The alternative method of financing was explained. Kircher said that Bar-Chris's contingent liability was only 25 per cent.

There was talk about operating alleys. Kircher said that BarChris did not operate any. Coleman and Ballard inquired whether BarChris built alleys on speculation, i. e., without any customer's contract for them. Kircher said BarChris did not.

There was discussion of officers' loans. Kircher said that the $155,000 had been repaid and that no further officers' loans were contemplated. Coleman said that this was wise, for loans from officers "indicated financial instability of the company."

Coleman did not participate personally in any further meetings of this sort. Casperson attended some and reported to Coleman. Ballard advised Coleman as to what he was doing.

After Coleman was elected a director on April 17, 1961, he made no further independent investigation of the accuracy of the prospectus. He assumed that Ballard was taking care of this on his behalf as well as on behalf of the underwriters.

In April 1961 Ballard instructed Stanton to examine BarChris's minutes for the past five years and also to look at "the major contracts of the company." [23] Stanton went to BarChris's office for that purpose on April 24. He asked Birnbaum for the minute books. He read the minutes of the board of directors and discovered interleaved in them a few minutes of executive committee meetings in 1960. He asked Kircher if there were any others. Kircher said that there had been other executive committee meetings but that the minutes had not been written up.

Stanton read the minutes of a few Bar-Chris subsidiaries. His testimony was vague as to which ones. He had no recollection of seeing the minutes of Capitol Lanes, Inc. or Biel or Parkway Lanes, Inc. He did not discover that BarChris was operating Capitol or that it planned to operate Bridge and Yonkers.

As to the "major contracts," all that Stanton could remember seeing was an insurance policy. Birnbaum told him that there was no file of major contracts. Stanton did not examine the agreements with Talcott. He did not examine the contracts with customers. He did not look to see what contracts comprised the backlog figure. Stanton examined no accounting records of BarChris. His visit, which lasted one day, was devoted primarily to reading the directors' minutes.

On April 25 Ballard wrote to Grant about certain matters which Stanton had noted on his visit to BarChris the day before, none of which Ballard considered "very earth shaking." As far as relevant here, these were (1) Russo's remark as recorded in the executive committee minutes of November 3, 1960 to the effect that because of customers' defaults, BarChris might find itself in the business of operating alleys; (2) the fact that the minutes of Sanpark Realty Corporation were incomplete; and (3) the fact that minutes of the executive committee were missing.

On May 9, 1961, Ballard came to New York and conferred with Grant and Kircher. They discussed the Securities and Exchange Commission's deficiency letter of May 4, 1961 which required the inclusion in the prospectus of certain ad-

23. Stanton was a very junior associate. He had been admitted to the bar in January 1961, some three months before. This was the first registration statement he had ever worked on.

ditional information, notably net sales, gross profits and net earnings figures for the first quarter of 1961. They also discussed the points raised in Ballard's letter to Grant of April 25. As to the latter, most of the conversation related to what Russo had meant by his remark on November 3, 1960. Kircher said that the delinquency problem was less severe now than it had been back in November 1960, that no alleys had been repossessed, and that although he was "worried about one alley in Harlem" (Dreyfuss), that was a "special situation." Grant reported that Russo had told him that his statement on November 3, 1960 was "merely hypothetical." On the strength of this conversation, Ballard was satisfied that the one-half of one per cent figure in the prospectus did not need qualification or elaboration.

As to the missing minutes, Kircher said that those of Sanpark were not significant and that the executive committee meetings for which there were no written minutes were concerned only with "routine matters."

It must be remembered that this conference took place only one week before the registration statement became effective. Ballard did nothing else in the way of checking during that intervening week.

Ballard did not insist that the executive committee minutes be written up so that he could inspect them, although he testified that he knew from experience that executive committee minutes may be extremely important. If he had insisted, he would have found the minutes highly informative, as has previously been pointed out (*supra* at p. 691). Ballard did not ask to see BarChris's schedule of delinquencies or Talcott's notices of delinquencies, or BarChris's correspondence with Talcott.

Ballard did not examine BarChris's contracts with Talcott. He did not appreciate what Talcott's rights were un-der those financing agreements or how serious the effect would be upon Bar-Chris of any exercise of those rights.

Ballard did not investigate the composition of the backlog figure to be sure that it was not "puffy." He made no inquiry after March about any new officers' loans, although he knew that Kircher had insisted on a provision in the indenture which gave loans from individuals priority over the debentures. He was unaware of the seriousness of BarChris's cash position and of how Bar-Chris's officers intended to use a large part of the proceeds. He did not know that BarChris was operating Capitol Lanes.[24]

Like Grant, Ballard, without checking, relied on the information which he got from Kircher. He also relied on Grant who, as company counsel, presumably was familiar with its affairs.

The formal opinion which Ballard's firm rendered to the underwriters at the closing on May 24, 1961 made clear that this is what he had done. The opinion stated (underscoring supplied):

"In the course of the preparation of the Registration Statement and Prospectus by the Company, we have had numerous conferences with representatives of and counsel for the Company and with its auditors and we have raised many questions regarding the business of the Company. Satisfactory answers to such questions were in each case given us, and all other information and documents we requested have been supplied. We are of the opinion that the *data presented* to us are accurately reflected in the Registration Statement and Prospectus and that there has been omitted from the Registration Statement no material facts *included in such data*. Although *we have not otherwise verified* the completeness or accuracy of the information furnished to us, on the basis of the foregoing and with the exception

---

24. Stanton was also unaware of this, although there was a reference to it in the minutes of the board of directors' meeting of November 22, 1960, which he presumably read.

of the financial statements and schedules (which this opinion does not pass upon), we have no reason to believe that the Registration Statement or Prospectus contains any untrue statement of any material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading."

Coleman testified that Drexel had an understanding with its attorneys that "we expect them to inspect on our behalf the corporate records of the company including, but not limited to, the minutes of the corporation, the stockholders and the committees of the board authorized to act for the board." Ballard manifested his awareness of this understanding by sending Stanton to read the minutes and the major contracts. It is difficult to square this understanding with the formal opinion of Ballard's firm which expressly disclaimed any attempt to verify information supplied by the company and its counsel.

In any event, it is clear that no effectual attempt at verification was made. The question is whether due diligence required that it be made. Stated another way, is it sufficient to ask questions, to obtain answers which, if true, would be thought satisfactory, and to let it go at that, without seeking to ascertain from the records whether the answers in fact are true and complete?

I have already held that this procedure is not sufficient in Grant's case. Are underwriters in a different position, as far as due diligence is concerned?

The underwriters say that the prospectus is the company's prospectus, not theirs. Doubtless this is the way they customarily regard it. But the Securities Act makes no such distinction. The underwriters are just as responsible as the company if the prospectus is false.

And prospective investors rely upon the reputation of the underwriters in deciding whether to purchase the securities.

There is no direct authority on this question, no judicial decision defining the degree of diligence which underwriters must exercise to establish their defense under Section 11.[25]

There is some authority in New York for the proposition that a director of a corporation may rely upon information furnished him by the officers without independently verifying it. See Litwin v. Allen, 25 N.Y.S.2d 667 (Sup.Ct.1940).

In support of that principle, the court in Litwin (25 N.Y.S.2d at 719) quoted from the opinion of Lord Halsbury in Dovey v. Cory, [1901] App.Cas. 477, 486, in which he said:

"The business of life could not go on if people could not trust those who are put into a position of trust for the express purpose of attending to details of management."

Of course, New York law does not govern this case. The construction of the Securties Act is a matter of federal law. But the underwriters argue that *Litwin* is still in point, for they say that it establishes a standard of reasonableness for the reasonably prudent director which should be the same as the standard for the reasonably prudent underwriter under the Securities Act.

In my opinion the two situations are not analogous. An underwriter has not put the company's officers "into a position of trust for the express purpose of attending to details of management." The underwriters did not select them. In a sense, the positions of the underwriter and the company's officers are adverse. It is not unlikely that statements made by company officers to an underwriter to induce him to underwrite may be self-serving. They may be un-

25. There are at least two decisions of the Securities and Exchange Commission which indicate that it is the Commission's view that an underwriter must go beyond and behind the representations of management. Matter of Richmond Corp., [1962–1964 Decisions] CCH Sec.L.Rep. ¶ 76,904 (1963); Matter of Charles E. Bailey & Co., 35 S.E.C. 33 (1953).

duly enthusiastic. As in this case, they may, on occasion, be deliberately false.

██ The purpose of Section 11 is to protect investors. To that end the underwriters are made responsible for the truth of the prospectus. If they may escape that responsibility by taking at face value representations made to them by the company's management, then the inclusion of underwriters among those liable under Section 11 affords the investors no additional protection. To effectuate the statute's purpose, the phrase "reasonable investigation" must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of "data presented" to them by the company. It should make no difference that this data is elicited by questions addressed to the company officers by the underwriters, or that the underwriters at the time believe that the company's officers are truthful and reliable. In order to make the underwriters' participation in this enterprise of any value to the investors, the underwriters must make some reasonable attempt to verify the data submitted to them. They may not rely solely on the company's officers or on the company's counsel. A prudent man in the management of his own property would not rely on them.

██ It is impossible to lay down a rigid rule suitable for every case defining the extent to which such verification must go. It is a question of degree, a matter of judgment in each case. In the present case, the underwriters' counsel made almost no attempt to verify management's representations. I hold that that was insufficient.

██ On the evidence in this case, I find that the underwriters' counsel did not make a reasonable investigation of the truth of those portions of the prospectus which were not made on the authority of Peat, Marwick as an expert.

Drexel is bound by their failure. It is not a matter of relying upon counsel for legal advice. Here the attorneys were dealing with matters of fact. Drexel delegated to them, as its agent, the business of examining the corporate minutes and contracts. It must bear the consequences of their failure to make an adequate examination.

██ The other underwriters, who did nothing and relied solely on Drexel and on the lawyers, are also bound by it. It follows that although Drexel and the other underwriters believed that those portions of the prospectus were true, they had no reasonable ground for that belief, within the meaning of the statute. Hence, they have not established their due diligence defense, except as to the 1960 audited figures.[26]

██ The same conclusions must apply to Coleman. Although he participated quite actively in the earlier stages of the preparation of the prospectus, and contributed questions and warnings of his own, in addition to the questions of counsel, the fact is that he stopped his participation toward the end of March 1961. He made no investigation after he became a director. When it came to verification, he relied upon his counsel to do it for him. Since counsel failed to do it, Coleman is bound by that failure. Consequently, in his case also, he has not established his due diligence defense except as to the audited 1960 figures.

### Peat, Marwick

Section 11(b) provides:

"Notwithstanding the provisions of subsection (a) no person * * * shall be liable as provided therein who shall sustain the burden of proof—

* * *

"(3) that * * * (B) as regards any part of the registration statement purporting to be made upon his authority as an expert * * * (i) he had, after reasonable investigation,

---

26. In view of this conclusion, it becomes unnecessary to decide whether the underwriters other than Drexel would have

been protected if Drexel had established that as lead underwriter, it made a reasonable investigation.

reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading * * *."

This defines the due diligence defense for an expert. Peat, Marwick has pleaded it.

The part of the registration statement purporting to be made upon the authority of Peat, Marwick as an expert was, as we have seen, the 1960 figures. But because the statute requires the court to determine Peat, Marwick's belief, and the grounds thereof, "at the time such part of the registration statement became effective," for the purposes of this affirmative defense, the matter must be viewed as of May 16, 1961, and the question is whether at that time Peat, Marwick, after reasonable investigation, had reasonable ground to believe and did believe that the 1960 figures were true and that no material fact had been omitted from the registration statement which should have been included in order to make the 1960 figures not misleading. In deciding this issue, the court must consider not only what Peat, Marwick did in its 1960 audit, but also what it did in its subsequent "S–1 review." The proper scope of that review must also be determined.

It may be noted that we are concerned at this point only with the question of Peat, Marwick's liability to plaintiffs. At the closing on May 24, 1961, Peat, Marwick delivered a so-called "comfort letter" to the underwriters. This letter stated:

"It is understood that this letter is for the information of the underwriters and is not to be quoted or referred to, in whole or in part, in the Registration Statement or Prospectus or in any literature used in connection with the sale of securities."

Plaintiffs may not take advantage of any undertakings or representations in this letter. If they exceeded the normal scope of an S–1 review (a question which I do not now decide) that is a matter which relates only to the crossclaims which defendants have asserted against each other and which I have postponed for determination at a later date.

### The 1960 Audit

Peat, Marwick's work was in general charge of a member of the firm, Cummings, and more immediately in charge of Peat, Marwick's manager, Logan. Most of the actual work was performed by a senior accountant, Berardi, who had junior assistants, one of whom was Kennedy.

Berardi was then about thirty years old. He was not yet a C.P.A. He had had no previous experience with the bowling industry. This was his first job as a senior accountant. He could hardly have been given a more difficult assignment.

After obtaining a little background information on BarChris by talking to Logan and reviewing Peat, Marwick's work papers on its 1959 audit, Berardi examined the results of test checks of BarChris's accounting procedures which one of the junior accountants had made, and he prepared an "internal control questionnaire" and an "audit program." Thereafter, for a few days subsequent to December 30, 1960, he inspected BarChris's inventories and examined certain alley construction. Finally, on January 13, 1961, he began his auditing work which he carried on substantially continuously until it was completed on February 24, 1961. Toward the close of the work, Logan reviewed it and made various comments and suggestions to Berardi.

It is unnecessary to recount everything that Berardi did in the course of the audit. We are concerned only with the evidence relating to what Berardi did or did not do with respect to those items which I have found to have been incorrectly reported in the 1960 figures in the prospectus. More narrowly, we are di-

rectly concerned only with such of those items as I have found to be material.

### Capitol Lanes

First and foremost is Berardi's failure to discover that Capitol Lanes had not been sold. This error affected both the sales figure and the liability side of the balance sheet. Fundamentally, the error stemmed from the fact that Berardi never realized that Heavenly Lanes and Capitol were two different names for the same alley. In the course of his audit, Berardi was shown BarChris's contract file. He examined the contracts in the file and made a list of them. The file must have included a contract with an outside purchaser for Heavenly Lanes, although no such contract was ever produced at the trial, for Berardi included Heavenly on his list. Apparently there was no contract in the file for a lane named Capitol because that name did not appear on Berardi's list.

Kircher also made a list of jobs. Heavenly was on his list. Capitol was not. Berardi compared the two lists and satisfied himself that he had the proper jobs to be taken into account. Berardi assumed that Heavenly was to be treated like any other completed job. He included it in all his computations.

The evidence is conflicting as to whether BarChris's officers expressly informed Berardi that Heavenly and Capitol were the same thing and that BarChris was operating Capitol and had not sold it. I find that they did not so inform him.

Berardi did become aware that there were references here and there in Bar-Chris's records to something called Capitol Lanes. He also knew that there were indications that at some time BarChris might operate an alley of that name. He read the minutes of the board of directors' meeting of November 22, 1960 which recited that:

"* * * the Chairman recommended that the Corporation operate Capitol Lanes, 271 Main Street, East Haven, Connecticut, through a corporation

which would be a subsidiary of Sanpark Realty Corp."

The minutes further recorded that:

"* * * it was unanimously agreed that the officers of the Corporation exercise their discretion as to operating Capitol Lanes through the aforesaid subsidiary on an experimental basis."

The junior accountant, Kennedy, read the minute book of Capitol Lanes, Inc., a Connecticut corporation organized in December 1960. The book contained a certificate of incorporation which empowered the corporation, among many other things, to own and manage bowling alleys. There was no minute in the book, however, that indicated that the corporation actually did own or manage one.

Berardi knew from various BarChris records that Capitol Lanes, Inc. was paying rentals to Talcott. Also, a Peat, Marwick work paper bearing Kennedy's initials recorded that Capitol Lanes, Inc. held certain insurance policies, including a fire insurance policy on "contents," a workmen's compensation and a public liability policy. Another Peat, Marwick work paper also bearing Kennedy's initials recorded that Capitol Lanes, Inc. had $1,000 in a fund in Connecticut. A note on this paper read:

"Traced to disbursements book—advanced for operation of alley—not expensed at 12/31/60."

Logan's written comments upon the audit contained an entry reading as follows:

"When talking to Ted Kircher in latter part of '60 he indicated one subsidiary is leasing alley built by Bar-Chris—the profit on this job should be eliminated as its ownership is within the affiliated group."

Opposite this note is an entry by Berardi reading as follows:

"Properties sold to others by affiliates. Capitol Lanes is paying currently lease rentals which amount to a lease purchase plan."

This note is somewhat ambiguous. If by "others" Berardi meant outside buyers, then it would seem that he should have accounted in some way for this sale, which he did not do. Presumably, by "others" he meant "other affiliates." Hence, he regarded the transaction, whatever he thought it to have been, as an intercompany one. Apparently Logan so understood Berardi's explanation.

Berardi testified that he inquired of Russo about Capitol Lanes and that Russo told him that Capitol Lanes, Inc. was going to operate an alley some day but as yet it had no alley. Berardi testified that he understood that the alley had not been built and that he believed that the rental payments were on vacant land.

I am not satisfied with this testimony. If Berardi did hold this belief, he should not have held it. The entries as to insurance and as to "operation of alley" should have alerted him to the fact that an alley existed. He should have made further inquiry on the subject. It is apparent that Berardi did not understand this transaction.

In any case, he never identified this mysterious Capitol with the Heavenly Lanes which he had included in his sales and profit figures. The vital question is whether he failed to make a reasonable investigation which, if he had made it, would have revealed the truth.

Certain accounting records of Bar-Chris, which Berardi testified he did not see, would have put him on inquiry. One was a job cost ledger card for job no. 6036, the job number which Berardi put on his own work sheet for Heavenly Lanes. This card read "Capital Theatre (Heavenly)." In addition, two accounts receivable cards each showed both names on the same card, Capitol and Heavenly. Berardi testified that he looked at the accounts receivable records but that he did not see these particular cards. He testified that he did not look on the job cost ledger cards because he took the costs from another record, the costs register.

■■■ The burden of proof on this issue is on Peat, Marwick. Although the question is a rather close one, I find that Peat, Marwick has not sustained that burden. Peat, Marwick has not proved that Berardi made a reasonable investigation as far as Capitol Lanes was concerned and that his ignorance of the true facts was justified.

### Howard Lanes Annex

Berardi also failed to discover that this alley was not sold. Here the evidence is much scantier. Berardi saw a contract for this alley in the contract file. No one told him that it was to be leased rather than sold. There is no evidence to indicate that any record existed which would have put him on notice. I find that his investigation was reasonable as to this item.

### Burke Lanes

This $25,000 error was not material. Furthermore, there is nothing to show that it was Berardi's fault. He was advised that the item represented "extra work." He had no reasonable ground to believe that actually it was a loan.

### Worcester and Atlas-Bedford

I have already found that Berardi erred in treating these two alleys as fully completed and that he should have taken Pugliese's estimate. I have also found, however, that this error was not material.

This disposes of the inaccuracies in the 1960 sales figures. I turn now to the errors in the current assets which involve four items: cash, reserve for Federal Lanes, factors' reserves and Howard Lanes Annex, which latter I have already covered.

As to cash, Berardi properly obtained a confirmation from the bank as to BarChris's cash balance on December 31, 1960. He did not know that part of this balance had been temporarily increased by the deposit of reserves returned by Talcott to BarChris conditionally for a limited time. I do not believe that Berardi reasonably should have

known this. Although Peat, Marwick's work papers record the fact that these reserves were returned, there was nothing to indicate that the payment was conditional. Russo obviously did not reveal this fact. It would not be reasonable to require Berardi to examine all of BarChris's correspondence files when he had no reason to suspect any irregularity.

As to the reserve on Federal Lanes, there is little to add to the earlier discussion of this subject in this opinion. I appreciate that in that instance the court has substituted its judgment for that of Russo and Berardi. For the reasons previously mentioned, I believe that their judgment was clearly wrong.

As to factors' reserves, it is hard to understand how Berardi could have treated this item as entirely a current asset when it was obvious that most of the reserves would not be released within one year. If Berardi was unaware of that fact, he should have been aware of it.

The net result, as far as current assets are concerned, is that Peat, Marwick is responsible for the errors as to reserves but not for those involving the cash item and the receivable from Howard Lanes Annex.

### Contingent Liabilities

Berardi erred in computing the contingent liability on Type B leaseback transactions at 25 per cent. He testified that he was shown an agreement with Talcott which fixed the contingent liability at that amount. In this testimony he was mistaken. No such document is contained in Peat, Marwick's work papers. The evidence indicates that it never existed. Berardi did not examine the documents which are in evidence which establish that BarChris's contingent liability on this type of transaction was in fact 100 per cent. Berardi did not make a reasonable investigation in this instance. Although I have found that the error in understating contingent liabilities as of December 31, 1960 would not have deterred a prospective purchaser, the error is nevertheless of some importance because it apparently led Trilling into making a

larger error in computing the contingent liability figure as of April 30, 1961.

### The S-1 Review

The purpose of reviewing events subsequent to the date of a certified balance sheet (referred to as an S-1 review when made with reference to a registration statement) is to ascertain whether any material change has occurred in the company's financial position which should be disclosed in order to prevent the balance sheet figures from being misleading. The scope of such a review, under generally accepted auditing standards, is limited. It does not amount to a complete audit.

Peat, Marwick prepared a written program for such a review. I find that this program conformed to generally accepted auditing standards. Among other things, it required the following:

"1. Review minutes of stockholders, directors and committees. * * *

"2. Review latest interim financial statements and compare with corresponding statements of preceding year. Inquire regarding significant variations and changes.

* * *

"4. Review the more important financial records and inquire regarding material transactions not in the ordinary course of business and any other significant items.

* * *

"6. Inquire as to changes in material contracts * * *.

* * *

"10. Inquire as to any significant bad debts or accounts in dispute for which provision has not been made.

* * *

"14. Inquire as to * * * newly discovered liabilities, direct or contingent * * *."

Berardi made the S-1 review in May 1961. He devoted a little over two days to it, a total of 20½ hours. He did not discover any of the errors or omissions pertaining to the state of affairs in 1961 which I have previously discussed at

length, all of which were material. The question is whether, despite his failure to find out anything, his investigation was reasonable within the meaning of the statute.

What Berardi did was to look at a consolidating trial balance as of March 31, 1961 which had been prepared by BarChris, compare it with the audited December 31, 1960 figures, discuss with Trilling certain unfavorable developments which the comparison disclosed, and read certain minutes. He did not examine any "important financial records" other than the trial balance. As to minutes, he read only what minutes Birnbaum gave him, which consisted only of the board of directors' minutes of BarChris. He did not read such minutes as there were of the executive committee. He did not know that there was an executive committee, hence he did not discover that Kircher had notes of executive committee minutes which had not been written up. He did not read the minutes of any subsidiary.

In substance, what Berardi did is similar to what Grant and Ballard did. He asked questions, he got answers which he considered satisfactory, and he did nothing to verify them. For example, he obtained from Trilling a list of contracts. The list included Yonkers and Bridge. Since Berardi did not read the minutes of subsidiaries, he did not learn that Yonkers and Bridge were intercompany sales. The list also included Woonsocket and the six T-Bowl jobs, Moravia Road, Milford, Groton, North Attleboro, Odenton and Severna Park. Since Berardi did not look at any contract documents, and since he was unaware of the executive committee minutes of March 18, 1961 (at that time embodied only in Kircher's notes), he did not learn that BarChris had no contracts for these jobs. Trilling's list did not set forth contract prices for them, although it did for Yonkers, Bridge and certain others. This did not arouse Berardi's suspicion.

Berardi noticed that there had been an increase in notes payable by BarChris. Trilling admitted to him that BarChris was "a bit slow" in paying its bills. Berardi recorded in his notes of his review that BarChris was in a "tight cash position." Trilling's explanation was that BarChris was experiencing "some temporary difficulty."

Berardi had no conception of how tight the cash position was. He did not discover that BarChris was holding up checks in substantial amounts because there was no money in the bank to cover them.[27] He did not know of the loan from Manufacturers Trust Company or of the officers' loans. Since he never read the prospectus, he was not even aware that there had ever been any problem about loans from officers.

During the 1960 audit Berardi had obtained some information from factors, not sufficiently detailed even then, as to delinquent notes. He made no inquiry of factors about this in his S-1 review. Since he knew nothing about Kircher's notes of the executive committee meetings, he did not learn that the delinquency situation had grown worse. He was content with Trilling's assurance that no liability theretofore contingent had become direct.

Apparently the only BarChris officer with whom Berardi communicated was Trilling. He could not recall making any inquiries of Russo, Vitolo or Pugliese. As to Kircher, Berardi's testimony was self-contradictory. At one point he said that he had inquired of Kircher and at another he said that he could not recall making any such inquiry.

There had been a material change for the worse in BarChris's financial position. That change was sufficiently serious so that the failure to disclose it made the 1960 figures misleading. Berardi did not discover it. As far as results were concerned, his S-1 review was useless.

---

27. One of these checks was a check to the order of Peat, Marwick in the amount of $3,000. It was dated April 4, 1961. It was deposited by Peat, Marwick on May 29, 1961.

Accountants should not be held to a standard higher than that recognized in their profession. I do not do so here. Berardi's review did not come up to that standard. He did not take some of the steps which Peat, Marwick's written program prescribed. He did not spend an adequate amount of time on a task of this magnitude. Most important of all, he was too easily satisfied with glib answers to his inquiries.

This is not to say that he should have made a complete audit. But there were enough danger signals in the materials which he did examine to require some further investigation on his part. Generally accepted accounting standards required such further investigation under these circumstances. It is not always sufficient merely to ask questions.

Here again, the burden of proof is on Peat, Marwick. I find that that burden has not been satisfied. I conclude that Peat, Marwick has not established its due diligence defense.

### The Causation Defense

Section 11(a) provides that when a registration statement contains an untrue statement of a material fact or omits to state a material fact, "any person acquiring such security * * * may * * * sue." Section 11(e) provides that:

"The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and

the value thereof as of the time such suit was brought * * *."

Section 11(e) then sets forth a proviso reading as follows:

"Provided, that if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable."

Each defendant in one form or another has relied upon this proviso as a complete defense. Each maintains that the entire damage suffered by each and every plaintiff was caused by factors other than the material falsities and omissions of the registration statement. These factors, in brief, were the decline in the bowling industry which came about because of the fact that the industry was overbuilt and because popular enthusiasm for bowling diminished.

These adverse conditions had begun before these debentures were issued, as evidenced by the growing defaults in customers' notes discounted with Talcott. Talcott did not discount any new notes for BarChris after April 1961. BarChris's financial position, as we have seen, was materially worse in May 1961 then it had been on December 31, 1960.

As time went on, conditions grew worse, both for BarChris and the industry. The receipts of alley operators diminished. New construction of alleys fell off. By 1962 it had almost ceased.

There is a wide disparity in the factual pattern of purchases and sales of BarChris debentures by the plaintiffs in this action. Some plaintiffs bought theirs when the debentures were first issued on May 16, 1961. Others bought theirs later in 1961. Still others purchased theirs at various dates in 1962, some even as late as September 1962, shortly before Bar-

Chris went into Chapter XI. In at least one instance, a plaintiff purchased debentures after BarChris was in Chapter XI.

There is a similar disparity as to sales. Some plaintiffs sold their debentures in 1961. Others sold theirs in 1962. Others never sold them.

The position taken by defendants in their affirmative defenses is an extreme one which cannot be sustained. I cannot say that the entire damage suffered by every plaintiff was caused by factors other than the errors and omissions of the registration statement for which these defendants are responsible. As to some plaintiffs, or as to part of the damage sustained by others, that may be true. The only practicable course is to defer decision of this issue until the claim of each individual plaintiff is separately considered. As stated at the outset, this opinion is devoted only to matters common to all plaintiffs.

### Other Defenses

Defendants have pleaded additional defenses of estoppel, waiver, release and the statute of limitations. The first three apply, if at all, only to certain plaintiffs, not to every one. These issues, therefore, are also deferred.

I will treat the defense of the statute of limitations in the same way. This may depend to some extent upon the knowledge of individual plaintiffs. Therefore, the question can more readily be determined when the evidence with respect to each separate plaintiff is reviewed.

### Plaintiffs' Motion to Notify Debenture Purchasers Who Are Not Parties

At the conclusion of the trial, plaintiffs moved for an order directing that notice "of the pendency of this action" be given by publication, and to the extent possible, by mail, to all persons who purchased BarChris debentures between May 16, 1961 and October 25, 1962. Plaintiffs ask that the notice advise these persons that they may "file a statement of their claim" with the court, that the court will allow or disallow their claims, and if it

allows them, will determine the "amount of recovery," and that if their claims are not filed by a specified date, "their claim will be barred." In March 1966 before the trial of this action, plaintiffs made a similar motion asking the court to decide at that time that in the event that defendants were held liable after trial, the court would then direct that such a notice be sent to debenture purchasers not then parties. On April 29, 1966, I denied that motion, without prejudice to its renewal at the end of the trial.

This action was begun on October 25, 1962. At that time there were nine plaintiffs whose complaint alleged that they sued on behalf of themselves "and in a representative capacity on behalf of all other and present and former holders of" the debentures. Subsequently, without opposition, eight plaintiffs were permitted to intervene in February 1963, and ten more in April 1963.

Thereafter, twenty-five more purchasers sought leave to intervene in May 1964. Judge Ryan indicated that he would deny the motion unless the applicants alleged that none of them had discovered or should have discovered the falsities and omissions of the registration statement more than one year prior to the filing of their motion. When none of the applicants so alleged, Judge Ryan denied their motion by order filed on August 25, 1964. His order was reversed by the Court of Appeals, which held that the applicants should be permitted to intervene despite the fact that they would have been barred by the one-year statute of limitations if they had filed a new independent suit. Escott v. Barchris Construction Corporation, 340 F.2d 731 (2d Cir. 1965), cert. denied sub nom. Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965).

In accordance with this decision, I subsequently permitted additional purchasers to intervene. At the time this action went to trial on June 8, 1966, there were sixty-five plaintiffs. No one has sought leave to intervene since then.

This is a spurious class action within Rule 23(a) (3) as the Rule read

prior to its amendment on July 1, 1966. Escott v. Barchris Construction Corporation, *supra.*

It falls into that category because, although the rights of the various debenture purchasers are several, "there is a common question of law or fact affecting the several rights * * *."

When the Rules of Civil Procedure, including Rule 23, were amended, the Supreme Court's order (383 U.S. 1031) provided that the amended Rules should apply in actions pending on July 1, 1966, "except to the extent that in the opinion of the Court their application in a particular action then pending would not be feasible or would work injustice * * *."

The amendment makes substantial changes in Rule 23. It now requires the court to determine "as soon as practicable after the commencement" of an action, whether it is to be maintained as a class action. If it is, the court shall direct that notice be given to the members of the class advising that unless they request to be excluded from the class, any judgment in the action will be binding upon them, and that if they desire, they may appear in the action through counsel.

The parties are in agreement that it is not now and has never been feasible to apply the amended Rule to this action, which was begun over three and one-half years before the Rule was amended and which had actually been on trial for almost a month before the amended Rule took effect. The old Rule as it stood prior to the amendment governs this case. The question is whether the procedure now requested by plaintiffs is required by that Rule.

It may be noted that a determination of the amount of recovery of any such new parties would involve more than a mere arithmetical computation of their damages. It would be necessary to consider as to each new plaintiff the causation question previously mentioned. It would also be necessary to decide whether he knew or should have known of the falsities and omissions of the registration statement more than one year before this action was originally instituted. See Escott v. Barchris Construction Corporation, 340 F.2d 731, at 733 n. 3.

The opinion of the Court of Appeals in the present action does not provide a definite answer to this question, although Judge Friendly's concurring opinion expresses his views upon it. The court did not have before it a request that notice be given to nonparties who have never previously been heard from. The court was concerned only with an application by specific purchasers for leave to intervene. In holding that the application should have been granted, the court held that the statute of limitations was tolled for their benefit by the fact (which the court assumed for the purpose of the appeal, without deciding) that the original plaintiffs had begun the action on time.

In York v. Guaranty Trust Company, 143 F.2d 503, 529 (2d Cir. 1944), rev'd on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), the Court of Appeals "suggested" that if the trial court finds for plaintiffs in a spurious class action, it should take appropriate steps to notify all other members of the class to intervene. In Bascom Launder Corp. v. Telecoin Corp., 204 F.2d 331 (2d Cir. 1953), cert. denied, 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953), the Court of Appeals withdrew that suggestion, as far as a jury trial is concerned. In Escott v. Barchris Construction Corporation, *supra,* Judge Friendly in his concurring opinion (340 F.2d at 736 and n. 2) said in substance that he would not favor such a procedure even in a nonjury case, at least as far as persons "barred by limitations from starting actions on their own account" are concerned. All purchasers of BarChris debentures whom plaintiffs now ask the court to notify are in that category, for more than three years have elapsed since the debentures were first offered to the public (Securities Act of 1933 § 13 (15 U.S.C. § 77m)).

 It is well settled in this Circuit that a judgment in a spurious class action does not bind members of the class who were not parties to the action. Na-

gler v. Admiral Corporation, 248 F.2d 319 (2d Cir. 1957); Fox v. Glickman Corporation, 355 F.2d 161 (2d Cir. 1965), cert. denied, 384 U.S. 960, 86 S.Ct. 1585, 16 L.Ed.2d 672 (1966); Lipsett v. United States, 359 F.2d 956 (2d Cir. 1966).

They are free to begin a new action even though the plaintiffs in the first suit were unsuccessful.

 It is because of this that the suggestion in York v. Guaranty Trust Company, *supra*, has been criticized by the text writers. It seems unfair to permit a member of the class to "remain on the sidelines while the parties litigate the issues, with no risk of being bound by an unfavorable decision, and then come in to take advantage of a favorable ruling." 3 Moore, Federal Practice ¶ 23.13 at 3476 (2d ed. 1967).

This is "one-way intervention." It is not permissible at this stage of a case under Rule 23, as amended. In my opinion Rule 23 as it read prior to July 1, 1966 should not be construed to require it.

Sixty-five purchasers of BarChris debentures have already participated in this action. No other purchaser has shown any interest in it. For whatever reason, all the others have slept on their rights until it is now too late for them to begin an action on their own account. To invite them into this action now that defendants have been found responsible would give them an undeserved windfall. To do so would be highly prejudicial to defendants. It would be of no benefit to the present plaintiffs, who will recover whatever damages they are found to be entitled to, regardless of the other members of the class. The only participants in the present action who would benefit by such a course would be plaintiffs' attorneys, who might expect a larger fee.

In Cherner v. Transitron Electronic Corporation, 201 F.Supp. 934 (D.Mass. 1962), Judge Wyzanski denied a motion similar to this which was made before trial. He said (201 F.Supp. at 936):

"No precedent supports the suggestion that the plaintiffs or their counsel have a moral duty to act as unsolicited champions of others."

He also said (at 936):

"Rule 23 should not be used 'as a device to enable client solicitation.'"

I agree with that statement. I see no significant difference as far as this aspect is concerned between a motion made in advance of trial and one made after trial. In so saying, I intend no reflection upon plaintiffs' attorneys in this action whose conduct in the trial of this case has been beyond reproach.

Cherner v. Transitron Electronic Corporation, *supra*, was eventually settled. At that point it was defendants, not plaintiffs, who insisted as a condition of the settlement that Judge Wyzanski issue a "bar order" inviting other members of the class to come in and participate in the settlement on pain of being barred from an independent prosecution of their own claims. Judge Wyzanski granted such an order, although he expressed doubt as to its validity. Cherner v. Transitron Electronic Corporation, 221 F.Supp. 48 (D.Mass.1963).

This second *Cherner* case is not authority for plaintiffs' position here. In the first place, there is a clear distinction between inviting nonparties in to share in a settlement fund and inviting them in to prove their separate claims in full at defendants' expense. In the second place, it would seem to be clear in this Circuit, under the rule of the *Nagler* case and those which have followed it, that such a bar order would be invalid. And yet that is the kind of order which plaintiffs ask the court to make.

Plaintiffs have found some precedent for their request in decisions in other circuits. The leading case is Union Carbide and Carbon Corporation v. Nisley, 300 F.2d 561 (10th Cir. 1961), petition for cert. dismissed sub nom. Wade v. Union Carbide and Carbon Corporation, 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962), which approved the giving of a similar notice to nonparties. That decision is not binding upon me. In the absence of controlling authority in this circuit, I decline to follow it.

Plaintiffs' motion is denied.

*Further Proceedings in this Action*

Although some of the parties have already filed briefs which touch upon the status of the separate plaintiffs upon the issues which I have reserved for later decision, other parties have not discussed these questions to any extent in the briefs already filed. No party has as yet filed any brief with respect to the cross-claims. I will give all parties until April 19, 1968 to file any further memoranda on these questions. If any party desires oral argument upon them, a date for such argument will be fixed.

Defendants' motions to dismiss this action, upon which decision was reserved at the trial, are denied. Motions made at various times during the trial to strike certain testimony are also denied, except in so far as such motions pertain to evidence relating to the issues still undecided.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law with respect to the issues determined herein.

So ordered.